UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

COMMUNITY HEALTH SOLUTIONS Case no. 8:06-bk-1215-CPM
 OF AMERICA, LLC, Chapter 11

 Debtor.
_____

LARRY S. HYMAN, as Chapter 11 Trustee
 of the Estate of COMMUNITY HEALTH
 SOLUTIONS OF AMERICA, LLC, et al., Adv. no. 8:06-bk-328-CPM

 Plaintiffs,

vs.

MIRABILIS VENTURES, INC. and
 COMMON PAYMASTER CORPORATION,

 Defendant.
_____/

## MOTION TO DISMISS COMPLAINT

Defendant, COMMON PAYMASTER CORPORATION ("CPC"), by its undersigned counsel and pursuant to Bankruptcy Rule 7012, moves this Court for entry of an order dismissing the Complaint herein as it relates to CPC, for the reasons that the Complaint fails to state any claim upon which relief may be granted and the fraud counts do not contain sufficient particularity. In support of this motion, CPC submits the following.

 I. THE COMPLAINT

Although it is difficult to ascertain with any degree of certainty due to the hyperbolic and vague nature of the allegations contained in the Complaint, both of the Plaintiffs appear initially to attempt to plead fraudulent transfer actions under Sections 544 and 548 of the Bankruptcy

Code against both of the Defendants. The Plaintiff CHS also seeks money damages against the Defendants under various state-law theories. Specifically:

1. In Count I, both Plaintiffs seek recovery against both Defendants under Section 548 of the Bankruptcy Code, to avoid "Transfers" made by one plaintiff to one defendant both prior and subsequent to the commencement of the underlying bankruptcy case, on the theory that the "Transfers" were made with the actual intent to hinder, delay and defraud creditors;

2. In Count II, both Plaintiffs seek recovery against both Defendants under Section 544 of the Bankruptcy Code and Chapter 712, Florida Statutes, to avoid "Transfers" made by one plaintiff to one defendant both prior and subsequent to the commencement of the underlying bankruptcy case, on the theory that the "Transfers" were constructively fraudulent;

3. In Count III, both Plaintiffs seek "turnover" of the allegedly fraudulent "Transfers" pleaded in Counts I and II, pursuant to Section 550 of the Bankruptcy Code;

4. In Count IV, the Plaintiff CHS seeks a money judgment against both Defendants, for one defendant's alleged conversion of "Transfers" and "all valuable contents" of both Plaintiffs and of two non-parties;

5. In Count V, the Plaintiff CHS seeks a money judgment and reasonable attorneys' fees against the Defendant Mirabilis Ventures, Inc. for "common law fraud in the inducement" and, apparently, Florida's "Wrongful Act Doctrine;"

6. In Count VI, the Plaintiff CHS seeks a money judgment against CPC for its alleged breach of a contract; and

7. In Counts VII, VIII & IX, the Plaintiff CHS seeks a money judgment against CPC under theories of open account, account stated and unjust enrichment, based on CPC's alleged failure to make payments under a contract.

II. FACTUAL BACKGROUND

For the reasons more fully set forth in Section III below, CPC anticipates that the Plaintiffs will be required to file an amended complaint herein. The Plaintiffs have not conducted a sufficient investigation to permit them to understand the events upon which they rely to attempt to state their claims. CPC accordingly submits the following as an accurate representation of the transactions and relationships between the Plaintiffs and the Defendants.

A. The Mirabilis Part.

During the fall of 2005, the defendant Mirabilis Ventures, Inc. ("Mirabilis") was approached by Gary Simmons, the principal of the Plaintiff Cadent Underwriters, Inc. ("Cadent), regarding Simmons' potential sale of Cadent and certain of its affiliated companies, including the Debtor Community Health Solutions of America, LLC ("CHS"), BenComp National Corp. ("BenComp") and Cadent Administrators, Inc. ("CAI"). During the initial and subsequent meetings, Simmons told Mirabilis that CHS, which was a medical management company and through its affiliate, Cadent Underwriters, a third-party administrator of health claims, was unable to fund its payroll obligations and needed to borrow funds. Simmons claimed that CHS's financial setbacks were caused by a host of separate problems, including its loss of lucrative contracts with state agencies in Texas and Ohio; litigation expenses; its failure to obtain a Medicaid contract in Florida; and changes to the enrollment process for South Carolina's Medicaid program. However, according to Simmons, despite the revenue losses Simmons maintained numerous management and IT personnel that otherwise were unnecessary but for

Simmons's hope of obtaining new business. Simmons' statements regarding CHS's revenue reductions were true; revenues for CHS peaked in 2003 at roughly $23 million, but they fell by roughly 70 percent, to approximately $7 million, by 2005.[1] In October of 2005, CHS did not have sufficient funds to meet its payroll obligations. At that time, CHS requested a loan from Mirabilis. Mirabilis agreed and provided CHS with a $500,000 line of credit. CHS quickly exhausted the original line of credit, and on November 6, 2005, it requested a second loan, this time for $250,000. Mirabilis agreed to the second request. Both of the lines of credit were fully documented, with CHS granting Mirabilis a security interest in virtually all of its personal property assets. Mirabilis duly perfected its security interests by filing UCC-1 financing statements with the Florida Secretary of State.[2] By the end of November, CHS had drawn approximately $649,000 on its $750,000 credit line. The foregoing was prior to Mirabilis acquiring any equity in CHS.

On November 21, 2005, Mirabilis, CHS (which was represented by counsel), Simmons and the other existing equity unit holders entered into a Purchase Agreement, by which Simmons sold 2,653,332 equity units in CHS to Mirabilis. These units constituted roughly 25 percent of all of the equity units of CHS, and included 2 of the 3 voting units owned by Simmons.[3] The Purchase Agreement also provided for the following, among other things:

- $10,000 in cash, paid by Mirabilis to CHS and booked as a capital contribution;

---

[1] CHS's FY 2004 revenues were just under $15.6 million, and its FY 2005 revenues were just over $7 million. CHS's revenues for the first quarter of 2006 totaled approximately $915,000, or less than $4 million on an annualized basis. Plaintiffs characterize this catastrophic reduction in revenues as a "relatively minor working capital shortfall." See Complaint, ¶ 10. Plaintiffs' choice of adverb and adjective is misleading, at best. Simmons' own pre-acquisition projections show insufficient revenues to meet operating expenses.

[2] Copies of all of the loan documents have been provided to the Trustee and to the United States Trustee, and will be provided to any other person on request.

[3] CHS at that time had only three issued and outstanding shares of voting units. All three were owned by Simmons.

4

- $475,000 in a reduction of the sums owed by CHS to Mirabilis on the lines of credit, which was intended to be booked as an additional capital contribution to CHS;
- A $3 million line of credit from Mirabilis to CHS.[4]

It was only after the execution of the Purchase Agreement that Mirabilis began to discover the true condition of CHS. For example, In December of 2005, Mirabilis discovered that CHS was in danger of being shut down because it allegedly had utilized monies paid to it in trust to fund its own operations. Mirabilis also discovered that CHS was being forced to find new office space because its lease expired December 31 and could not be renewed because the office building was to be demolished.[5] CHS also drew substantially on the new $3 million line of credit, but made no significant repayment.

In February of 2006, Mirabilis sent a notice to CHS advising it that it had defaulted under the $3 million line of credit and advising CHS that Mirabilis intended to avail itself of the contractual and legal remedies available to it. At that time, and for the first time, Mirabilis exercised its control of the board of CHS (which it had acquired in November of 2005) to terminate Simmons' employment and replace him with Brian Fischer.[6] Fischer quickly discovered that the financial records of CHS and its affiliates were entirely disorganized, and he requested that Mirabilis send a team of financial professionals to review the documents of the

---

[4] A copy of the Purchase Agreement has been provided to the Trustee and to the Unite States Trustee, and will be provided to any other person on request. Although Mirabilis technically could have assumed full operational control of CHS as of the date of the Purchase Agreement, it did not do so, but rather Simmons remained in charge of CHS until February of 2006.

[5] Plaintiffs allege that Mirabilis "caused" CHS and its affiliated entities to relocate from their office premises. See Complaint, ¶ 14. In fact, Mirabilis's affiliate Presidion Solutions, Inc. allowed CHS and its affiliates to occupy space it owns or controls, and Presidion spent considerable sums to prepare the new office for CHS and its affiliates. Although there is a written lease agreement for CHS and its affiliates to lease this space, they have never signed the lease, and they have never paid any rent. Presidion intends to seek appropriate relief under Sections 362 and 365 of the Bankruptcy Code.

[6] Mr. Simmons was escorted from CHS's business premises by on-duty Pinellas County deputy sheriffs.

companies. By March of 2006, Fischer and Mirabilis concluded with reasonable certainty that CHS may fail to resurrect its business revenues or pay its creditors, including Mirabilis (which at the time was owed in excess of $1.5 million). Fischer and Mirabilis concluded that it was in the best interests of the creditors of CHS for the company to obtain financial oversight of the Court and file bankruptcy.

    B. The CPC Part.

CPC is an affiliate of Mirabilis. It is not, as the Plaintiffs allege, a "payroll processing company," but rather it is a "common paymaster," hence the reason of the name of CPC. There is a significant difference. A payroll processing company merely engages in processing the payroll obligations of a company owed to the company's employees. Depending on the nature of the service, the cost in the market typically runs between 3 and 5 percent of the total payroll obligation. A common paymaster, on the other hand, provides all of the payroll services, benefits, and human resources management for all of the employees of a group of affiliated companies. In this case, CPC employs all of the various employees and assigns them to their work location. CPC is responsible for the payment of not only the salaries of the employees, but also of the pertinent employer taxes, including, for example, FICA, FUTA, and SUTA, and also, the employee benefits such as insurance, vacation time, sick days, life and disability insurance as well as HR Management. These additional costs are charged by CPC to its customer as part of its fee; in addition, just like a payroll processing company, CPC will charge an administrative fee to cover the cost of processing the payroll obligations. CPC maintains that the administrative fee associated with the payroll processing portion of the services rendered by CPC is comparable to those charged by a payroll processing company; the matter has been referred to Steve Oscher for verification. Mr. Oscher has been instructed to report to the Office of the United States Trustee.

Effective October 1, 2005, the Plaintiff Cadent entered into a contract with CPC, under which Cadent was to provide third party health administration for CPC employees and be paid a fee for doing so. At approximately the same time, CPC entered into an agreement with Cadent for CPC to provide payroll staffing services to Cadent. These employees were subsequently assigned by Cadent to CHS.

CPC paid the employees assigned to Cadent/CHS, both prior and subsequent to the commencement of the bankruptcy case, even though Cadent/CHS has failed to pay the sums owed under the contract. As of July 31, 2006, CHS/Cadent owed CPC over $283,000 for post-petition payroll and human resource services alone. CPC has not disputed that there is an accrual of approximately $157,000 of pre- and post-petition administrative fees to Cadent under the second contract, but it does not agree that such sums are owed to Cadent.

The Plaintiffs allege that CPC charged CHS up to 39 percent of the gross payroll amount as its administrative fee. The allegation confuses a payroll processing company and a common paymaster. As outlined above, the "administrative fee" includes not only the fee associated with processing the payroll checks, but also fees associated with taxes, benefits and other services provided by CPC but which typically would not be associated with a mere payroll processor. Attached hereto as Exhibit "A" is a spreadsheet showing every payroll invoice that the Plaintiffs attached to their Complaint. Most notably, prior to the commencement of the bankruptcy case the Plaintiff agreed to these services and accepted the invoices and paychecks. Likewise, post-petition, the Trustee has expressly agreed to CPC services and fees, and has accepted the paychecks. In fact, CPC had offered to withdraw its services, but the Trustee requested that CPC continue to provide its services post-petition at a total burden rate of 35 percent.

III.     MOTION TO DISMISS.

In the Complaint the plaintiffs characterize pre-and post-petition transfers of "funds" and "services" under contracts as fraudulent transfers. Recognizing the weakness of that position, the Plaintiffs then include a number of other state-law counts that, on their face, seem more applicable under the fact pattern alleged. However, none of the counts should survive, because none states a claim upon which relief can be granted.

Count I, seeking to avoid a fraudulent transfer of funds and services as "actual fraud," is brought by both plaintiffs against both defendants.[7] The "Transfers" sought to be avoided are alleged to have been made purely by the plaintiff Cadent, and not by CHS. For this reason, CHS is improperly joined as a plaintiff. Similarly, the transfers were all alleged to have been made to CPC, and not to Mirabilis, and Mirabilis accordingly is improperly joined as a defendant. Additionally, it is impossible to determine what precisely was "transferred." The complaint defines the "Payroll Transfers" as the charges listed on Exhibit "A" to the complaint, but Exhibit "A" includes all payroll transfers, including employee wages, 401(k) contributions, insurance premiums, and a host of other charges. Fraud must be pleaded with particularity, and this Count does not contain the required particular allegations. Accordingly, this Count should be dismissed.

Count II, seeking to avoid a fraudulent transfer of funds and services as "constructive fraud," suffers from similar defects as Count I. Initially, there is an improper joinder of parties

---

[7] Interestingly, the Trustee, through his counsel, has filed suit against Cadent Underwriters in an adversary proceeding in this bankruptcy case, but at the same time the Trustee's counsel claims to represent Cadent Underwriters in this adversary proceeding. This curious set of circumstances was not disclosed in the Trustee's application to employ his bankruptcy counsel; CPC asserts that Cadent Underwriters is improperly joined as a plaintiff and cannot be represented herein by the counsel that purports to represent it. Of course, the Trustee's counsel represented Presidion Solutions, the owner of the premises from which the Debtor and Cadent Underwriters operate and a creditor herein, as well as TenShi Leasing, a wholly-owned subsidiary of TenShi Enterprises and the entity that owns the office equipment that the Debtor and Cadent Underwriters use in the operation of their business and another creditor herein, until August 1, 2006, when it resigned so that its attorneys could not be used as a "pawn in an undisclosed chess game." See Composite Exhibit "B."

because both plaintiffs sue both defendants, when it appears that only one plaintiff (Cadent) should sue only one defendant (CPC), because (i) CHS is alleged to have made no transfers, and (ii) Mirabilis is not alleged to have received any transfers. Cadent cannot be a plaintiff herein, and cannot be represented by the counsel that purports to represent it. See note 7, supra. Also, it is impossible to determine precisely what property the plaintiffs allege was transferred. This Count also should be dismissed.

Count III is brought under Section 550 of the Bankruptcy Code to compel the turnover of the items alleged transferred fraudulently. Because the fraudulent transfer counts fail, this count also must be dismissed.[8]

Count IV is brought solely by CHS, and seeks money damages from both defendants for conversion. Although the count is inartfully drafted and hence difficult to understand, CHS appears to allege that conversion liability should lie against both Defendants because (i) CPC overcharged under its contract to provide payroll services to CHS, and (ii) CPC failed to pay Cadent for services rendered under a different contract. To the extent that the conversion involves CPC's alleged failure to perform properly under a contract, the count fails to state any claim upon which relief may be granted and violates the economic loss rule. CHS also alleges that the "Defendants utilized their own resources to remove all valuable contents of the going concern" of CHS, Cadent and other unspecified affiliated entities. What these "valuable contents" might be, or who their unidentified owners might be, is not disclosed. CPC cannot reasonably respond to this allegation, and it should be repleaded with more specificity.[9]

---

[8] The fundamental problem with all of the fraudulent transfer counts is that they improperly attempt to force a breach of contract claim into the fraudulent transfer statutes. On this basis too, these counts must be dismissed.
[9] Because the fraudulent transfer counts set forth in Counts I through III fail, CPC questions the subject matter jurisdiction of this Court on all remaining counts.

Count V purports to seek money damages, and attorneys' fees, for "common law fraud in the inducement." Although the allegations appear to center around CPC's alleged failure to comply with the terms of its contract, the sole target of this count, as expressed in its prayer for relief, is the Defendant Mirabilis. CPC accordingly is not a party to this count.[10]

Count VI seeks money damages from CPC for its alleged breach of a contract with Cadent. Although CHS is not a party to the contract at issue, it is only CHS which seeks any recovery. CHS lacks standing to bring this count.

Finally, Counts VII, VIII and IX all involve efforts by CHS to obtain a money judgment against CPC for services rendered by Cadent under its contract with CPC. Again, the wrong plaintiff is seeking recovery; to the extent the claims exist at all, they are owned by Cadent, not by CHS. There is also an insufficient allegation as to the inadequacy of a remedy at law.

---

[10] As set forth above, CPC is not a party to this count and accordingly makes no response. CPC notes, however, that the Plaintiffs' request for attorneys' fees in this count is purportedly grounded upon Florida's Wrongful Act Doctrine. The doctrine, however, is inapplicable in this case. See City of Tallahassee v. Blankenship & Lee, 736 So.2d 29, 30 (Fla. 1st DCA 1999).

IV. CONCLUSION

The Complaint appears to have been filed in haste, without considering the identity of the proper parties, and without due regard for the provisions of Bankruptcy Rule 7009(b), which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity . . . ."  The Plaintiffs must be ordered to amend the complaint so that it complies with the applicable rules of procedure and states a claim upon which relief may be granted.

/s/ Mark J. Bernet
Mark J. Bernet
Florida Bar No.:  606359
BUCHANAN INGERSOLL & ROONEY PC
SunTrust Financial Centre
401 E. Jackson Street, Suite 2500
Tampa, Florida  33602
(813) 222-8180 Telephone
(813) 222-8189 Facsimile
Attorneys for Common Paymaster Corporation

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic Filing and/or U.S. Mail this 11th day of August, 2006, to John A. Anthony, Esquire and Stephenie M. Bernacki, Esquire, GrayRobinson P.A., Post Office Box 3324, Tampa, Florida 33601.

                                            /s/ Mark J. Bernet
                                            Mark J. Bernet