IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
- - - - - - - - - - - - - - - - -x
IN RE:                            :
                                  :
                                  :
COMMUNITY HEALTH SOLUTIONS        :   Case No. 06-01215-8C1
    OF AMERICA                    :        Chapter 11
                Debtor            :
- - - - - - - - - - - - - - - - -x
LARRY HYMAN, Chapter 11 Trustee   :
                                  :
                Plaintiff         :
    vs.                           :   Adversary No. 06-0328
                                  :
COMMON PAYMASTER and              :
MIRABILIS VENTURES, INC.          :
                                  :
                Defendants        :
- - - - - - - - - - - - - - - - -x
```

                              801 N. Florida Avenue
                              Tampa, Florida
                              August 4, 2006
                              2:10 P.M.


                          **H E A R I N G**

1. Motion for Protective Order by Frank L. Amodeo (Doc.120);
2. Emergency Motion to Compel Deposition Testimony and
Production of Documents from Frank Amodeo (Doc. 121);

**Adv. 06-328.** 1. Emergency Motion to Shorten Time to Answer
                     Complaint by Plaintiff (Doc. 5);
                  2. Emergency Motion to Shorten Time for
                     Discovery Responses by Plaintiff (Doc. 6).




B E F O R E:  THE HONORABLE CATHERINE PEEK McEWEN, Judge

_____

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida  33556
(813) 920-1466

A P P E A R A N C E S:

For Chapter 11
 Trustee Hyman:        JOHN ANTHONY, Esquire
                     GrayRobinson, P.A.
                     201 N. Franklin Street, #2200
                     Tampa, Florida  33602
                     (813) 273-5000

For Mirabilis
 and Pacific
 Atlantic
 Capital
 Corporation:        THOMAS LASH, Esquire
                     FRAZIER CARRAWAY, Esquire
                     DAMON ELLIS, Esquire
                     Saxon, Gilmore, et al, P.A.
                     201 E. Kennedy Boulevard #600
                     Tampa, Florida  33602

For Common
PayMaster:          MARK J. BERNET, Esquire
                     Buchanan Ingersoll Professional Corp
                     401 E. Jackson Street, Suite 2500
                     Tampa, Florida  33602
                     (813) 228-8189
                     bernetmj@bipc.com

For Frank
 Amodeo:            HARRISON T. SLAUGHTER, JR.
                     Leventhal & Slaughter
                     111 North Orange Avenue #700
                     Orlando, Florida  32801

For U.S. Trustee:    THERESA BOATNER, Esquire
                     Office of the U.S. Trustee
                     501 E. Polk Street, #1200
                     Tampa, Florida  33602
                     (813) 228-2000

Also Present:       JEFF WARREN, Esquire

                     LARRY HYMAN, Chapter 11 Trustee

1      **P R O C E E D I N G S**

2           COURTROOM DEPUTY:  Judge, the cases on for

3      today are Case No. 06-01215-8C1, Community Health

4      Solutions of America, motion for a protective order and

5      emergency motion to compel deposition and a companion

6      Adversary 06-328, Community Health Solutions of

7      America's emergency motion to shorten time and an

8      emergency motion to shorten time.  All right.

9           THE COURT:  The Court will take appearances.

10     And let me know if you are present for just the case or

11     just the adversary proceeding or both, please, starting

12     wherever.

13          MR. ANTHONY:  Your Honor, John Anthony on

14     behalf of Larry Hyman, Trustee, who is also in the

15     courtroom.

16          MS. BOATNER:  Theresa Boatner for the United

17     States Trustee on all matters.

18          MR. SLAUGHTER:  Your Honor, Harrison

19     Slaughter on behalf of Frank Amodeo.

20          THE COURT:  Both the adversary and the case?

21          MR. SLAUGHTER:  Yes, Your Honor.

22          THE COURT:  Thank you.

23          MR. LASH:  Good afternoon, Your Honor, Tom

24     Lash on behalf of Mirabilis Ventures, Inc. and Pacific

25     Atlantic Capital Corporation.  Mr. Frazier Carraway, my

26     partner --

1    MR. CARRAWAY:  Good afternoon, Your Honor.

2    MR. LASH:  He'll be the lead counsel on

3    06-0328, the fraudulent transfer action.  And

4    Mr. Ellis, my other partner, who is on both of the

5    cases.  Good afternoon, Your Honor.

6    THE COURT:  All right.  You said Ellis?

7    MR. LASH:  Damon Ellis.

8    MR. ELLIS:  Yes, Your Honor.

9    THE COURT:  Damon Ellis, right.  Thank you.

10    MR. LASH:  Thank you, Your Honor.

11    THE COURT:  You're welcome.  And that's for

12    Mirabilis and Pacific Atlantic.  Thank you.

13    MR. BERNET:  Mark Bernet, Your Honor, on

14    behalf of Common PayMaster Corporation, solely in the

15    adversary.

16    THE COURT:  Okay.  Thank you.  Do you want to

17    come up here, if there's enough room.

18    MR. BERNET:  Yes, Your Honor, if we're ready

19    to go with that.

20    THE COURT:  We may end up taking that first,

21    I think.

22    MR. BERNET:  Okay.

23    MR. WARREN:  Good afternoon, Your Honor,

24    Jeffrey Warren.  I am here at the request of TenShi

25    Enterprises, Inc.  However, they contacted me a few

26    moments ago, which is why I'm in my dress

1    casual/emergency outfit.  But we are not appearing as

2    their counsel because we have not agreed yet to

3    represent them, but I did want to announce my presence.

4              THE COURT:  You are monitoring this basically

5    in anticipation of making an appearance on Monday?

6              MR. WARREN:  Yes, Your Honor.

7              THE COURT:  Okay.  Thank you.  All right,

8    doesn't it make sense to take up the adversary

9    proceeding first?

10             MR. ANTHONY:  I believe it does, Your Honor.

11             THE COURT:  Is there any agreement on that?

12             MR. ANTHONY:  I don't believe so, Your Honor.

13             THE COURT:  All right.  As I understand it,

14   you've got Mirabilis and Common PayMaster as

15   defendants.  Is there another one?

16             MR. ANTHONY:  No, Your Honor, that's the

17   adversary proceeding at issue.  And the claims that are

18   brought against Mirabilis in connection with that

19   specific adversary proceeding are only those wherein

20   the liability of Mirabilis appears to be coterminous

21   with that of PayMasters.

22             Your Honor may recall that in connection with

23   the Trustee's original involvement in the case and also

24   in connection with Your Honor's ruling that directed

25   the appointment of a Trustee, there were some questions

26   relating to the payroll accounts receivable where the

1    Debtor was processing for PayMasters.

2         There was also a question relating to the

3    administrative charge.  In fact, it had been

4    represented to Your Honor it was 3 or 4 percent.  In

5    fact, it went as high as 39 percent.

6         Your Honor, the adversary --

7         THE COURT:  I think everyone here said it was

8    around 40 percent.

9         MR. ANTHONY:  Yes.  And, Your Honor, what we

10   had basically alleged in the verified complaint -- and

11   it's actually verified by Joyce Dove, who has been with

12   the company for many years, both with Mr. Simmons

13   running it and with the Mirabilis involvement -- and

14   the documents that are attached to the complaint are

15   pretty straightforward.  They reflect 159,521.97 owed

16   and not disputed relating to payroll processing

17   services from October 1 through August 1.

18        The other component, that second type of

19   PayMaster liability is $438,462.73.  Again, it's

20   computed with a high degree of accuracy, based upon the

21   actual documents derived from the premises of the

22   Debtor.  In fact --

23        THE COURT:  That's going to be a matter of

24   proof.

25        MR. ANTHONY:  Yes, Your Honor.

26        THE COURT:  But we're here today on the

1    motion to, I guess, shorten discovery tools.

2              MR. ANTHONY:  Yes, Your Honor.

3              THE COURT:  And there's no agreement on that?

4    Who's representing -- oh, I'm sorry.  Mr. Carraway, you

5    are representing Mirabilis in the adversary proceeding.

6              MR. CARRAWAY:  Yes, ma'am.  And we've had no

7    discussions about this.  We found out when we got the

8    notices we were coming to see you today --

9              THE COURT:  Well, it --

10             MR. CARRAWAY:  -- there's no pending

11   discovery as well, so I don't have any idea of what the

12   quantum of documents or interrogatories we're talking

13   about.  I would hope that as we got discovery we could

14   have some agreement with the Trustee's counsel on what

15   would be a reasonable time to respond to it.  But the

16   allegations of the adversary are pretty broad and could

17   involve all-encompassing discovery.  I mean we could be

18   in a situation where we're coming to you and saying 30

19   days won't do.

20             THE COURT:  Right.

21             MR. CARRAWAY:  But that's pure speculation at

22   this point.

23             THE COURT:  No, I understand.  I understand.

24   And to be fair to you, we did have a hearing -- I think

25   it was last week -- the notion of shortened discovery

26   was discussed in general, so I think Mirabilis knew it

1    was coming, maybe.  Were you here, Mr. Lash?

2              MR. LASH:  No, ma'am.  Sorry, we were not

3    present at last week's hearing, so we weren't part of

4    that discussion.

5              THE COURT:  Okay.  Then you all would not

6    have known and I don't think that the transcript from

7    that one was typed up, as it has been in every other

8    instance that the Court has had a hearing.  So it was

9    discussed.

10             Okay, I have your concerns noted,

11   Mr. Carraway.

12             And then, Mr. Slaughter, you said that you

13   were here for both the adversary --

14             MR. SLAUGHTER:  Actually --

15             THE COURT:  Well, I know, Mr. Bernet, you're

16   here for Common PayMasters.

17             Did you have any involvement --

18             MR. SLAUGHTER:  No, Your Honor.

19             THE COURT:  Okay.  So you're just here for

20   the case?

21             MR. SLAUGHTER:  For Frank Amodeo, yes.  Thank

22   you.

23             THE COURT:  All right.  Mr. Bernet, Common

24   PayMasters?

25             MR. BERNET:  No agreement either with Common

26   PayMaster regarding the shortening of time to respond

1    to the complaint or regarding the discovery that's not

2    yet been propounded.

3              THE COURT:  Okay.

4              MR. BERNET:  And we were not aware of any

5    discussions that the Court may have had concerning

6    shortened discovery.

7              THE COURT:  Because you weren't here either.

8              MR. BERNET:  I wasn't here either.

9              THE COURT:  You weren't even in the case.

10             MR. BERNET:  No, ma'am.

11             THE COURT:  Okay.  All right.  I think first

12    of all, Mr. Anthony, let's go with the shortened answer

13    time.  Typically, in federal court, people get a longer

14    time than in state court.  What are you looking for?

15             MR. ANTHONY:  Your Honor, the reason that I

16    had taken some effort to outline the complaint briefly

17    is because there are no surprises.  During the several

18    months prior to the Trustee's appointment, the company

19    had been run by Mirabilis personnel.

20             There are still Mirabilis personnel.

21    Mr. Konicki, the man who filed the schedules, remains

22    on premises.  These documents, these issues may be

23    difficult to lawyers who literally in the last few

24    minutes have gotten into the case.  They are not

25    difficult to probe and establish.

26             Your Honor may recall that in the hearings

1    of June 21, July 12, and July 28 there was the

2    announcement that Mr. Oscher was on board as an expert

3    of sorts for Mirabilis to try to figure out these

4    issues.  We understand that he'll be available sometime

5    next week to talk about these issues.

6          But in the meantime, Mr. Hyman has been in

7    contact on a regular basis with Mr. Konicki on the

8    premises of the Debtor, trying to get these bills paid.

9    It's postpetition, it is extremely important to the

10   administration of the company.

11         The company has enough money to fund its

12   payroll next Wednesday.  Your Honor may recall that for

13   several hearings in a row Mirabilis and their counsel

14   had said -- and also Mr. Amodeo on behalf of Mirabilis

15   had told Mr. Hyman on June 20th of '06:  We have

16   500,000; we will lend it to you.  That --

17         THE COURT:  That's not -- I think that what I

18   heard is people were trying to work out terms.

19         MR. ANTHONY:  Right.

20         THE COURT:  I've heard that consistently and

21   I think that was the glitch.

22         MR. ANTHONY:  And those terms didn't get

23   worked out.  And the result of that is that the

24   company, obviously, is in a prejudice situation.

25   Mirabilis is experiencing no prejudice, understanding

26   these particular -- we could have alleged more.  We

1     could have made it more complex, but these are very

2     simple, straightforward counts that are documented and

3     can be easily established.

4              And, obviously, in the meantime, time is

5     running out on the company.  And that -- and this is

6     often the case in bankruptcy adversary proceedings --

7     time is running out in a manner that creates more

8     prejudice to the estate, its employees and its

9     creditors than whatever lawyer might be tapped at this

10    point to answer on behalf of Mirabilis.

11             I want to point out to Your Honor that I

12    wasn't here and Mr. Hyman wasn't here back when the

13    schedules were filed by Mirabilis.  I wasn't here,

14    Mr. Hyman wasn't here back when the postpetition

15    financing papers were presented to Your Honor by

16    Mr. Lash.  Mr. Hyman wasn't here and I wasn't here when

17    Your Honor made a finding of fraud, based upon some of

18    the same causes of action that we have some fairly tame

19    allegations about:  unjust enrichment --

20             THE COURT:  I don't know that I found fraud.

21    I think I found mismanagement, but somebody could

22    correct me if they've got the transcript.

23             MR. LASH:  That is my recollection exactly,

24    Your Honor.

25             MR. ANTHONY:  I wish Mr. Lash could wait his

26    turn.  I think Your Honor has set enough time for this.

1          THE COURT:  Okay.

2          MR. ANTHONY:  The big point, Your Honor, is

3     that the prejudice that the Debtor and the estate are

4     to suffer, by far, is more serious and should be more

5     compelling to Your Honor than whatever the hardship of

6     Mr. Lash, or whoever on that side, plans to answer on

7     behalf of Common PayMasters.

8          Your Honor, there are three different things

9     that we want with respect to the motion pertaining to

10    the complaint.  We asked for ten days.  Ten days is

11    Monday, the 7th.  If Your Honor thinks that that would

12    be a big surprise or a hardship, we don't mind a little

13    bit more time than that.  But the next payroll is

14    Wednesday and then the next payroll after that, we need

15    some relief.

16         THE COURT:  Well, here's my problem.  If they

17    answer and they deny, I mean I guess your argument

18    assumes that we need to get expedited treatment because

19    they're going to roll over and say, yeah, I want to

20    give you the money.  I mean it has got to be -- it's

21    not going to come in by Wednesday, even if I made them

22    answer tonight.

23         MR. ANTHONY:  Right.  And, Your Honor,

24    hindsight being what it is, it's not worth going over

25    why we didn't file the complaint two months ago.

26    However, if we can have the pleadings -- if we can

1    frame the pleadings, then we can figure out why it was

2    that this company ran out of money.  And, obviously,

3    the nature and extent of the damages would change a lot

4    in another adversary proceeding if the company stops.

5         So we're all bound by some rules when we

6    plead.  We have to plead responsibly.  And I would

7    assume that the opposing counsel would reasonably

8    investigate.  They've already sent Mr. Oscher in to

9    investigate.  He's ready to talk with us.  These aren't

10   mysteries.  Mr. Hyman and Ms. Dove are going off of the

11   same documents as Mr. Konicki and Mr. Lash.

12        So we think that an answer and affirmative

13   defenses are not out of bounds for sometime next week.

14   Also, Your Honor -- and, by the way, that's not too

15   exotic, quite frankly, when an adversary proceeding is

16   holding up the administration of a Chapter 11 that is

17   in crisis.

18        Your Honor, the next point relates to the

19   discovery.  If it were only possible that we had the

20   discovery at issue today, that would be tremendous.

21   Some things have made that difficult, including, of

22   course, the fact that we have the conflict motion and

23   the related sword of Damocles that I referenced in past

24   hearings, this conflict hearing that's coming up on

25   Monday.

26        THE COURT:  But that doesn't relate to this

1     adversary proceeding --

2          MR. ANTHONY:  No, it doesn't.

3          THE COURT:  -- because Mr. Slaughter said

4     he's not going to be involved in that -- in this.

5          MR. ANTHONY:  Perfect.  But we are and so we

6     weren't able to have all of that discovery generated.

7     However, obviously, there is a reasonableness component

8     to discovery.  We don't want to propound a whole pile

9     of discovery about various things.

10         This is a carefully tailored adversary

11    proceeding designed to derive 597,000 and change from

12    the folks who said they had it for us.  And most of it

13    relates to postpetition transfers from the Debtor,

14    however else you want to characterize them, money

15    flowing from the Debtor or services flowing from the

16    Debtor that have not been compensated.  And we think

17    it's reasonable to say that provided that the discovery

18    we're seeking relates to the specific two accounts at

19    issue, services going one way to PayMasters; PayMaster

20    taking money from the payrolls as administrative fees;

21    that that is fair.

22         Your Honor, the third thing that we would ask

23    for, and I think it's consistent with the request for

24    other appropriate relief in both motions, is that Your

25    Honor conduct a status conference on this.  I see more

26    lawyers here than I expected and more lawyers than were

1    in the case.  But Mr. Lash has been here.  It appears

2    that three of those lawyers are from Mr. Lash's firm.

3    I feel confident that they would be ready, just as --

4    actually, just as Judge Williamson conducts case status

5    conference as soon as the answer is filed -- for us to

6    get back and find out what there is real disagreement

7    upon.

8         We want to meet with Mr. Oscher.  We'll take

9    his deposition if we have to.  The rules, as we

10   understood, were we could just talk to him.  But we

11   don't see that this is going to be something that will

12   require a lot of masterful pleading-related relief --

13   pleading and motions practice.  So we believe that

14   that's responsible.

15        If we serve discovery and it has a whole

16   bunch of things in it that Mr. Carraway thinks are not

17   appropriate, he can file an objection and we can take

18   that up in due course.  The penalty will be on me

19   because we have asked more than we could fairly get.

20        But this is important.  Obviously, Mirabilis

21   has seen this coming.  Obviously, Mr. Amodeo has seen

22   this coming for a couple of months and the company

23   needs to stay afloat and we believe that the delays in

24   administering various aspects of this case primarily

25   prejudice Mr. Hyman and the estate and don't unfairly

26   prejudice anybody, Common PayMaster or Mirabilis with

1    respect to getting these pleadings framed in the

2    adversary.  Thank you, Your Honor.

3         THE COURT:  Okay.  Who wants to go next?

4         MR. BERNET:  I can start.

5         THE COURT:  Go ahead and deal with both

6    motions, might as well --

7         MR. BERNET:  Yes, ma'am.

8         THE COURT:  -- as he did.

9         MR. BERNET:  Your Honor, Common PayMaster

10   does object, if nothing else, on due process grounds to

11   being forced to respond to a complaint that, as of this

12   morning, still had not received in the mail.  Of

13   course, I do have a copy of the complaint.  I printed

14   it off-line.

15        I'm not sure what the emergency is.  The best

16   I can tell, in being new to the case, it appears that

17   the Trustee has refused the terms for DIP financing

18   offered by the Mirabilis entities and in response is

19   trying to steamroll a lawsuit in order to obtain funds

20   which Mr. Anthony represents is a slam dunk and in

21   order to fund the operating expenses here.

22        I note that there is a Plan on file which

23   proposes -- propounded by the Mirabilis entities and

24   initially by the Debtor; the Trustee subsequently

25   withdrew support for it, is my understanding.  But

26   there is a Plan on file which calls for 100 percent

1    payment to creditors.

2            The prejudice here is one of the Trustee's

3    own making.  We need to investigate this.  Mr. Anthony

4    suggests that the amount in controversy is about a,

5    what, 600,000 I believe was his comment.  I've read the

6    complaint carefully.  I see 159,000 as the number which

7    is listed as being in controversy.  I don't know where

8    the rest of that money comes from.

9            The complaint, perhaps it's straightforward

10   to the author, but it is not straightforward to me.  I

11   have spent a fair amount of time reading it,

12   investigating behind it.  It is loaded with all kinds

13   of pleading problems.

14           We have an entity, Cadent Underwriters which

15   filed the lawsuit as co-plaintiff.  Mr. Anthony

16   purports to represent Cadent Underwriters, which

17   creates yet another conflict issue.  I don't know where

18   that came from, other than the fact that it is Cadent

19   Underwriters which is the proper plaintiff.  CHS, the

20   Debtor, represented now by the Trustee, does not appear

21   from my reading of the complaint to really have

22   standing to bring this cause of action.  The contracts

23   at issue are such that it is Cadent Underwriters which

24   should be bringing this complaint.

25           There a related adversary, my

26   understanding is, to substantively consolidate Cadent

1 Underwriters.  My understanding is there was a Clerk's

2 default.  Whether that has been reduced to judgment or

3 not, I don't know.  It wasn't as of the commencement of

4 this case.  So right off the bat, there is a parties'

5 problem that's going to draw a motion to dismiss.

6         Additionally, the prayers for relief

7 throughout this complaint contain problems as to who it

8 is that's being sued.  We're very loose in terms of

9 defendants did this; defendants did that.  Well, there

10 are two defendants.  One is a contracting party, one is

11 not.  Is there a conspiracy, can there be a conspiracy

12 to breach a contract?

13         Because at heart, even there are fraudulent

14 transfer actions alleged here for the purpose of

15 obtaining jurisdiction in this court, at heart this is

16 a breach of contract case that does not belong in

17 Bankruptcy Court.  It is a state law breach of contract

18 case and it doesn't belong here.

19         I need more time to investigate this

20 complaint, particularly now that Mr. Anthony says it's

21 very straightforward.  It's not.  It is very complex

22 and there's an awful lot more going on here than

23 appears to have been pleaded.

24         Similarly, we do have a problem with

25 shortening time to respond to discovery.  We don't know

26 what that discovery is going to be.  It's very

1     complicated in terms of which party, which plaintiff,

2     which defendant, who are you talking about?

3          My client, Common PayMaster, is very careful

4     to maintain its separate corporate identity.  It will

5     be difficult -- well, not difficult but it will be

6     something that I'll need to be careful about to answer

7     on behalf of that company, not on behalf of others.

8     And there's a lot going on here.

9          My understanding is the offer for DIP

10    financing on the terms that were proposed remains open.

11    We can keep this estate going if they want to.

12    Conversely, they can agree to the Plan which calls for

13    everyone to get paid.

14         But violating due process and changing the

15    rules of pleading because a lawsuit didn't get filed

16    two months sooner than it actually did, doesn't strike

17    me as a real good reason.  Similarly, along the same

18    lines, we're here and so I'm not going to complain

19    about this being called an emergency hearing.  We're

20    here and we're prepared to go forward.  But the

21    emergency is, I really don't know.

22         THE COURT:  I think it's the Debtor is going

23    to be broke pretty soon.

24         MR. BERNET:  That could be.  We just kind of

25    want to set the ground rules in this case.  We don't

26    want everything filed as an emergency motion.  And I

1      think -- I know Mr. Anthony well enough, he recognizes

2      very well his obligations to make certifications and I

3      know that he has done so in good faith here.  But we

4      just want to be careful that not everything here gets

5      turned into an emergency so we have to force Your Honor

6      to juggle her calendar to accommodate us on things

7      where there weren't even telephone calls in advance.

8      Now in fairness, I don't think Mr. Anthony knew I was

9      in the case.

10           THE COURT:  No.

11           MR. BERNET:  So in this particular instance,

12      there would not have been an ability to make that phone

13      call.

14           THE COURT:  I think over the course of the

15      last several weeks, at least, the tenor has been that

16      they're getting close to running out of money and you

17      weren't in the case to hear that.

18           MR. BERNET:  No, ma'am.

19           THE COURT:  And so that's probably why they

20      teed this up as an emergency.  All right, do you have

21      anything else?

22           MR. BERNET:  No, ma'am.

23           THE COURT:  Okay.  And do you want to add

24      more to your initial remarks?

25           MR. CARRAWAY:  If I may.  Your Honor, on the

26      discovery issue -- and I'll start with that first since

1    I've already spoken to it -- my concern is not that

2    Mr. Anthony may propound unreasonable discovery.  My

3    concern is given the allegations in the complaint that

4    we have before us, that reasonable discovery could be

5    quite expansive.

6            THE COURT:  I note that there are nine counts

7    that involve fraud --

8            MR. CARRAWAY:  Right.

9            THE COURT:  -- and some other theories,

10   rather than just straight collection actions, although

11   it does include some counts for straight collection

12   actions.

13           MR. CARRAWAY:  And that would be easy,

14   probably, as the other stuff might be very difficult.

15   I also have an abiding interest in what Mr. Oscher has

16   to tell us.  And I have some concern that Dragnet

17   discovery could disturb the files and delay the

18   completion of his report.

19           I heard from Mr. Anthony that Mr. Oscher may

20   be ready next week.  I think Mr. Oscher is a fine

21   expert, but from past dealings I suspect that's late

22   next week, rather than early.  I have an additional

23   issue.  If he is ready next week, I am going to be out

24   of the country until Monday a week.  So, that's an

25   additional concern that affects both of these for me.

26   We won't be back till the 15th.

1           THE COURT:  When do you leave?

2           MR. CARRAWAY:  Tomorrow.  Moving to the issue

3      of shortening time to respond, I was a little surprised

4      to hear him ask for August 7th as part of this ten

5      days.  Because the actual motion asks for August 11th.

6      In any event, given my particular circumstance, either

7      would be very difficult.  I would like, in a perfect

8      world, to wait to hear from Mr. Oscher to know what the

9      facts are, because there are a lot of facts alleged

10     here.

11          But even responding with a motion to dismiss,

12     I would like to have the time to consider the

13     pleadings.  And I agree with Mr. Bernet, I think it's

14     more likely than not a motion to dismiss, given the

15     pleading of some of the things that under the Rules

16     require some particularity that has not been met in my

17     view.

18          I'd like to look at some of the cases to make

19     sure that my view of what the Rules require is in fact

20     correct or should require a motion.  We've done some

21     research since we got it.  It looks like some of the

22     others may be in firm under the case law.  But before I

23     sign a motion to this Court, I'd like to have the time

24     to review the law.  I think that that's my obligation

25     as a lawyer appearing in front of you and given the

26     short timing of the filing of this, the mailing of the

1    summons, the emergency setting of this hearing, I

2    really haven't had time to do that. And I would like

3    to properly plead.

4           I have no objection to some shortening. I

5    think 10 days is unreasonable. Perhaps 15 days from

6    the date of this hearing would be more appropriate.

7           And I have not practiced before you before.

8    I'd like to also ask the Court to consider giving us

9    some direction on Rule 26, as to whether that will

10   apply in this case.

11         THE COURT: Okay. It will apply in this

12   case. Because it's an adversary proceeding, it will

13   apply.

14         MR. CARRAWAY: Okay.

15         THE COURT: Unless there's a groundswell -- a

16   chant that says: Don't make us do that. But I doubt

17   that that's going to happen here.

18         MR. CARRAWAY: Okay. Thank you, Your Honor.

19         THE COURT: So, all right. I should tell you

20   that Mirabilis's registered agent called me yesterday

21   to talk about whether that person needed to be involved

22   on the telephone end of this hearing and he expressed

23   his desire not to appear today and instead to have his

24   lawyer appear and he wondered why he was getting

25   e-mails from somebody, not from the Court.

26         And I said: Well -- because he told me that

1    Tom Lash had been appearing for Mirabilis -- and I

2    explained to him that an adversary proceeding is like a

3    lawsuit within the umbrella and until you have a lawyer

4    appear in the lawsuit, then he, as the person that has

5    been served, I guess would need to appear.

6         He said:  I'll make sure Mr. Lash enters an

7    appearance.  But we did not discuss anything about the

8    adversary proceeding, other than what I've just said.

9         So, Mr. Anthony, do you want to respond to

10   anything in particular?

11        MR. ANTHONY:  Your Honor, briefly, that

12   the --

13        THE COURT:  And talk in general about -- or

14   respond to the notion that there are very many counts

15   in here, some of them would be sort of complex

16   commercial litigation in some folks' minds.  There are

17   a few that are simple.  And talk to that.  If you serve

18   a discovery request that's aimed at all nine, that's

19   not limited to just the two counts that --

20        MR. ANTHONY:  Sure.  And, Your Honor, that is

21   exactly what I intended to address.  Because,

22   obviously, Mr. Bernet, in explaining how much he needs

23   to do to get caught up, revealed that he's done an

24   awful lot to get caught up.

25        And paragraph 16 of the complaint, which was

26   served on the 27th on both corporate entities in a

1    manner consistent with the rules, the paragraph says

2    that $478,000 and change were paid and payroll charges

3    were --

4           THE COURT:  What paragraph are you --

5           MR. ANTHONY:  Paragraph 16.

6           THE COURT:  Okay.

7           MR. ANTHONY:  And that is the specific,

8    clearly pled amount of the payment that was made over

9    the entire payroll processing period.  That's the

10    aggregate.  And what we said in that same paragraph is

11    that approximately 40,000 would be the appropriate

12    amount of the payment.  So 438,000 is at issue.

13           THE COURT:  I see it.  I see it.  Well, then

14    maybe Mr. Bernet hasn't boned up as much as you think

15    he has.

16           MR. ANTHONY:  Well, but he has been very

17    articulate.  And then if you take a look at

18    paragraph 18, it comes up with the 159,521.  And

19    that relates to the second element of PayMaster

20    obligations.

21           In fact, the balance of the complaint is

22    really quite simple.  Now with respect to the things

23    that could have been put in here -- and they were

24    almost coaxing -- I can't remember which attorney

25    mentioned:  Is there a conspiracy?  Well, we haven't

26    thrown in civil theft.  We haven't put in civil

1   conspiracy.  There are things that we could put in if

2   we were speaking to the universe of what led to the

3   appointment of the Trustee, but we haven't because we

4   wanted to keep it surgical.

5            The transfers are those two payments.  And,

6   admittedly, they've been incurred or taken over a

7   series of pay periods, either in the form of, to date,

8   free processing of work for PayMaster or the service

9   charges that PayMaster has taken out of the Debtor's

10  funds when it funds a payroll.  But these are two very

11  easy to apprehend and understand sets of payments.  And

12  the contract -- I'm sorry, the actual documents that

13  confirm the exact amount are documents that Ms. Dove

14  obtained from the same offices that Mr. Konicki, the

15  client contact for those three gentlemen, was present.

16           Mr. Hyman has not asked Mr. Konicki to leave

17  the premises.  He's still there every day.  He still

18  draws a Mirabilis paycheck.  And there is something

19  cathartic about having him there, able to verify that.

20           The numerosity of counts, Your Honor --

21           THE COURT:  There's something weird about

22  having the defendants' guy inside your house.  I don't

23  know.

24           MR. ANTHONY:  Well, Your Honor, the two

25  dynamics that are in play that are fairly unusual are,

26  number (1), an extremely well thought of financial

1    expert, forensic accountant, Mr. Oscher, has been

2    retained by Mr. Carraway's firm to come up -- to review

3    documents.  Of course, his opinion is only as good as

4    what he looks at, but --

5         THE COURT:  And he'll be the first to tell us

6    all of that.

7         MR. ANTHONY:  Yes, he will.  But we're

8    supposed to have full access to him.  I haven't seen

9    that but that some of that is --

10        THE COURT:  I think that statement was made

11   at a time when maybe Ms. -- I don't know who was here

12   on board for the Debtor's side of it or the Trustee,

13   but I think that was at a time when everybody was going

14   hand in glove before a lawsuit was filed against

15   Mirabilis.

16        MR. ANTHONY:  There weren't -- Your Honor,

17   hand in glove was something that was desired but not

18   something that was expected.  Obviously, I've said on

19   the record, and Mr. Hyman can back it up, that

20   June 20th that money was there.  PayMaster's counsel

21   says that the money is still there.  The events of

22   default include the appointment of a Trustee.  But he's

23   there, so we would have been in default.  Those weren't

24   real loan documents.

25        And candidly, Your Honor, we had said in

26   court, with a note coming from Mirabilis -- and I think

1    the U.S. Trustee was very strident on this point -- if

2    the note is coming from Mirabilis, then repayment will

3    be subject to defenses.  And that might not have made

4    Mirabilis real comfortable.

5         Anyway, I want to go briefly to the fact that

6    these are two very simple-to-determine computations.

7    They owe on accounts.

8         THE COURT:  Okay, let me just look at your

9    Section 548, which is your count that is aimed at

10   prepetition transfers.  You're not trying to say that

11   actual fraud is involved.  You're only trying to say

12   that it was simply a transfer made for no value and

13   that's it --

14        MR. ANTHONY:  Yes.

15        THE COURT:  -- you're not going to get into

16   fraud --

17        MR. ANTHONY:  We need to move it along.

18        MR. BERNET:  It's not what the complaint

19   says.

20        THE COURT:  Well, that's my point.  I'm

21   trying to figure out just how simple it is.

22        MR. ANTHONY:  Then, Your Honor, let it be

23   admitted -- amended *instanter* so that we can get the

24   response.

25        MR. BERNET:  You're dismissing Count I?

26        MR. ANTHONY:  I hope not.

1          THE COURT:  No.  What I think what he's

2     saying is that it's being made under 548 -- wait a

3     minute.  Is this a BAPCPA case?  Yes.  Right?  This

4     was filed after --

5          MR. LASH:  Yes, Your Honor.

6          MR. ANTHONY:  Yes.

7          MR. LASH:  Yes, Your Honor.

8          THE COURT:  All right.  Then I'm in the right

9     Code.  I just have to make sure I have the right one in

10    front of me.  I think what he's saying is that the

11    section of 548 that talks about -- 548(a)(1)(A) doesn't

12    apply; that only (B)(i) and (ii) apply.

13         MR. BERNET:  And excuse me for interrupting,

14    Your Honor, but they haven't pleaded that.  They --

15         THE COURT:  I understand that.  I think he's

16    trying to say that that's what it is today.  You're say

17    you're only going under 541(a)(1)(B)(i) and (ii) --

18         MR. BERNET:  It's 548, for the record, Your

19    Honor.

20         MR. ANTHONY:  Yes.

21         THE COURT:  What did I say?  548, thank you.

22         MR. ANTHONY:  And, Your Honor, with respect

23    to II and IV, if we can get the discovery and frame the

24    pleadings accordingly, I'd be happy to have Counts II

25    and IV -- II, III and IV abated.

26         THE COURT:  Well, that's next.  I was going

1    to go count by count.

2              MR. ANTHONY:  And that way --

3              THE COURT:  Count II involves all manner and

4    badges of fraud and this and that.

5              MR. ANTHONY:  How about this:  If Count II,

6    III, IV, and V were abated and we allowed the Court

7    to consider these, in many cases, postpetition

8    administrative payments that we think have been

9    improper by the Debtor to PayMaster that redounded to

10   the benefit -- and this isn't very abstruse -- that

11   redounded to the benefit not only of PayMasters, but of

12   Mirabilis as the parent.  And the reason they

13   benefitted Mirabilis is because the Debtor has been

14   doing the third-party administrative work, we

15   understand, postpetition and prepetition.  That's where

16   the 159 comes from.

17             So, Your Honor, if we took all of the ones

18   that involve any element of scienter or anything other

19   than an open account, account stated, breach of

20   contract, unjust enrichment and abated them and moved

21   the rest of it forward as fast as we could --

22             THE COURT:  And unjust enrichment is IX?

23             MR. CARRAWAY:  Yes, Your Honor.

24             MR. ANTHONY:  Yes.

25             THE COURT:  So you're throwing that in with

26   your suggestion that we abate II, III, IV, V, and IX?

1     MR. ANTHONY:  I'm sorry, II, III, IV, and V.

2     The reason for IX, Your Honor, is because the Trustee

3     believes that the estate has lost value on an unjust

4     enrichment theory, which isn't scienter related because

5     it has conferred those benefits upon Mirabilis.

6          THE COURT:  But the benefits are -- loss of

7     value is a different inquiry than an amount stated.

8     And is it loss of value of other than the monies, or is

9     it something like loss of value as a concern?

10         MR. ANTHONY:  Just the monies.  Your Honor,

11    the complex issues -- and there are obviously some

12    causes of action that are not yet ripened.  If payroll

13    stops, they will ripen and there will be a larger

14    complaint.

15         But at this point what we're talking about as

16    far as unjust enrichment is that the sum of 159,000 for

17    the payroll processing services that haven't been paid

18    since October of last year, right through postpetition,

19    and the overbillings for these administrative fees for

20    payroll processing of 478,000, less 40,000 that we

21    think is legitimate based upon what the Debtor paid in

22    the prior 12 months, those two sets of damages are the

23    amount of the unjust enrichment.

24         Obviously, I could not call Common

25    PayMaster's counsel because I didn't know he was in the

26    case.

1    THE COURT:  Yes, we've already discussed

2    that.  I understand.

3    MR. ANTHONY:  But hopefully -- he could have

4    called me and I certainly will call him after this

5    hearing so that I can address any questions or comments

6    he has.  And he's more than welcome between now and

7    whenever Your Honor asks him to answer discovery or the

8    pleadings to come on over to the offices of the Debtor,

9    Mr. Hyman's office and my own, and we don't want to

10   make a secret of it.  That's why we had all these

11   documents stapled to the pleading.

12   THE COURT:  All right.  Let me ask you

13   another question about Count I under 548.  Romanette

14   (ii) covers a whole bunch of elements that are couched

15   in the alternative that -- one of which has to be

16   proved in conjunction with Romanette (i) under (B).

17   And that may be something that would take some time for

18   anyone to study up on in order to respond as to one of

19   those.

20   If I were to require an expedited answer with

21   respect to Counts VI, VII, VIII, and IX, and assuming

22   that you hit a home run and they roll over and say,

23   yeah, you get your judgment, does that do enough?  In

24   other words, do we have to involve Count I?  Couldn't

25   we throw Count I into the mix of those that could

26   travel along a regular path, as it were?

1          MR. ANTHONY:  Yes, Your Honor, because --

2          THE COURT:  And they'll all join up at one

3     time when we get to some pretrial conference in the

4     future.  I mean they won't necessarily be separated

5     forever.

6          MR. ANTHONY:  Mr. Carraway and the two

7     lawyers who are going to be around when he's on

8     vacation, I'm sure, can -- I agree with that.  I think

9     it would be fine if we abate it as to those initial

10    ones, including Count I, and then proceeded with

11    respect to the rest -- and I think that between that

12    law firm and Mr. Oscher, surely --

13         THE COURT:  Now, Mr. Lash --

14         MR. ANTHONY:  -- these gentlemen can get

15    pleadings framed.

16         THE COURT:  -- are you capable, without

17    Mr. Carraway's assistance, on just those four, VI, VII,

18    VIII, and IX, able to frame a responsive pleading or a

19    defensive motion?  They've already promised you a

20    motion to dismiss -- or Mr. Bernet has.

21         MR. LASH:  I -- the phrasing by the Court --

22         THE COURT:  I don't mean competent --

23         MR. CARRAWAY:  I have every confidence in

24    him.

25         THE COURT:  Given your division of work

26    and workload and your vacation schedule, or what have

1    you --

2         MR. LASH:  I believe with regard to those

3    counts that we could fashion what we need to in the way

4    of a response with regard to those.

5         I was going to speak a little earlier, and I

6    apologize, I was certainly jumping the gun.  If the

7    Court has two seconds that it could indulge me, there

8    were a couple of things that were stated with regard to

9    more of the main case.

10        THE COURT:  We have all afternoon.

11        MR. LASH:  We do or we don't?

12        THE COURT:  We do.

13        MR. LASH:  Oh.  Well, thank you, Your Honor.

14   I just wanted to make sure the Court was informed.

15   There's several things the Court remembered and stated

16   very well.  I think one big issue here that Mr. Oscher

17   is looking into for us is these statements about all of

18   these monies and the services provided to Mirabilis.

19   Right now I can't say whether the Debtor actually ever

20   paid for any of those.  So, that is an additional issue

21   that Mr. Oscher is looking into, that he was just

22   tasked with, with this coming along.

23        THE COURT:  You're talking about a setoff

24   defense?

25        MR. LASH:  Yes, Your Honor, or the fact that

26   there was nothing ever paid, so how can it be recovered

1　　now?

2　　　　　　　THE COURT:  Uh-huh.  Well, I mean whatever

3　　the defenses are you want to raise, you can raise them.

4　　　　　　　MR. LASH:  Exactly, Your Honor.  It's just

5　　that there's more complexity to this and it goes to a

6　　higher level of in-depth analysis than one might

7　　originally think.

8　　　　　　　Additionally, I just wanted to make the Court

9　　aware that my firm did not file the schedules and that

10　　we did not file the postpetition financing motion.

11　　　　　　　THE COURT:  I know that.

12　　　　　　　MR. LASH:  Thank you.

13　　　　　　　THE COURT:  And the postpetition financing

14　　motion did not have a document with definitive terms

15　　attached to it.

16　　　　　　　MR. LASH:  Thank you, Your Honor.  Yes,

17　　exactly.  And the only other thing I wanted to make

18　　clear on the record was:  Mr. Konicki is not our client

19　　contact and, in fact, I have not spoken to Mr. Konicki

20　　since the installation of the Chapter 11 Trustee.

21　　　　　　　THE COURT:  Okay.

22　　　　　　　MR. LASH:  And neither has anyone else that

23　　I'm aware of in my office.  Thank you, Your Honor.

24　　　　　　　THE COURT:  Okay.  All right.

25　　　　　　　MR. BERNET:  Your Honor?

26　　　　　　　THE COURT:  I'm sorry, Mr. Bernet.

1          MR. BERNET:  I'm sorry, were you prepared to

2     rule?  And if you are, I can --

3          THE COURT:  We have all afternoon.

4          MR. BERNET:  Just one quick point.  The

5     representations concerning the administrative fee,

6     there is going to be a factual dispute about that, a

7     very large factual dispute.  It was not a 39 percent

8     fee that is comparable to the 1 percent fee that is

9     referenced in the complaint.

10          In due course, I think that's going to be

11     presented to Your Honor that it involves a whole host

12     of other services, including some payments that they

13     had not made previously that got lumped into a

14     subsequent invoice and made the numbers look much

15     higher than, in reality, they are.

16          THE COURT:  Okay.  You know, you all really

17     do need to get together on a Rule 26 conference.  And

18     apart from whatever ruling I make on the discovery with

19     respect to some of the counts, talk openly, you know,

20     about disclosing these things so that everyone -- you

21     know, you know things that Mr. Anthony doesn't know

22     that really if they're all black and white -- and

23     Mr. Hyman is an accomplished accountant as well -- if

24     they're all black and white like that, then you can

25     really pare down the areas that you're going to be

26     putting in front of the Court and really just limit,

1    you know what really is in dispute.

2            Ms. Boatner, do you have something you want

3    to add?

4            MS. BOATNER:  Your Honor, I just wanted to

5    advise the Court of my perceptions in this matter and I

6    think I've made my points before.  But at the time I

7    filed my motion to appoint a Chapter 11 Trustee, I set

8    forth in that motion various actions that I can support

9    with documentation provided by Mr. Lash and Mirabilis

10   and the Debtor that -- or, you know, I would not have

11   made those allegations.

12           The fact of the matter is that the money that

13   is being sought to be recovered for those payroll

14   amounts were in fact withdrawn from bank accounts of

15   the Debtor and I saw the bank accounts.  Now this --

16           THE COURT:  Debtor-in-Possession or Debtor?

17           MS. BOATNER:  Debtor and the

18   Debtor-in-Possession.

19           THE COURT:  Pre and post, uh-huh.

20           MS. BOATNER:  The fact is that Mr. Konicki

21   and Mr. Myers testified under oath at a 341 meeting.

22   And I believe it was Mr. Myers who testified that the

23   charge that was being made for payroll services was

24   4 percent.  He subsequently filed some kind of a

25   document, which I don't have before but I am sure is in

26   the court record, trying to explain away his incorrect

1     statement after it came to light in my motion or in a

2     subsequent hearing that in fact the Debtor was paying

3     this exorbitant amounts for payroll services.

4          These entities that are represented on that

5     side of the room are all controlled by Frank Amodeo.

6     Frank Amodeo is --

7          THE COURT:  Okay, Mr. Slaughter, you're in

8     the adversary proceeding right now.

9          MS. BOATNER:  -- he's a convicted felon.  He

10     was sentenced to two years imprisonment in Lewisburg

11     Federal Penitentiary.  He has been disbarred from the

12     Georgia Bar for stealing money from clients.  He

13     controls all of these entities and many more that he

14     has taken over.  He is not unknown to the United States

15     Trustee's Office because of actions taken in other

16     cases that are strikingly similar to what has occurred

17     in this case.

18          The actions taken, both pre and postpetition,

19     in this case by Mr. Amodeo or by persons or entities

20     controlled by Mr. Amodeo are organized and orchestrated

21     with the intent, I believe, to take over these entities

22     and then to have those actions cleansed by the

23     bankruptcy in the Bankruptcy Court.  And part of the --

24          THE COURT:  It's not happening in this case.

25          MS. BOATNER:  Well, part of what I believe is

26     occurring here and has occurred in other cases is that,

1    you know, the entities controlled by Mr. Amodeo come

2    before the Court and -- well, they came before the

3    Court in this case:  initially tried to arrange for

4    postpetition financing and to hire various individuals

5    who were actually employed by Mirabilis in an attempt

6    to elevate Mirabilis's claims to postpetition

7    administrative status.

8         We find out subsequently that in fact

9    Mirabilis took more money out of the Debtor than it

10   disclosed on the schedules.  The schedules are

11   blatantly false.  There is no two ways around it.

12   Mirabilis took payments that weren't disclosed.

13        THE COURT:  And Mr. Konicki is the one that

14   signed those, as I remember.

15        MS. BOATNER:  He did.  And I'm sure that, you

16   know, he --

17        THE COURT:  It again makes me wonder, but.

18        MS. BOATNER:  Well, again, I'm trying to give

19   Your Honor some flavor for what's occurred here.  This

20   is all part of the same control issue by Mirabilis.

21   Mirabilis came in, took over the Debtor, took over its

22   computer, its phone system, and moved its premises to

23   space controlled by Mirabilis and ousted -- forcibly

24   ousted its founder and all, as I understand it, at the

25   specific direction of Frank Amodeo.

26        The entities that have experienced --

1           THE COURT:  This is all pre Mr. Hyman being

2     in --

3           MS. BOATNER:  Correct.  Entities that have

4     experienced similar treatment have found themselves in

5     similar circumstances.  Mr. Amodeo comes in and

6     promises a lot.  Everybody signs documents that are, in

7     fact -- and I've read them -- likely unenforceable.

8     But it's too late because Mirabilis has already taken

9     over the Debtor and already -- basically, it's

10    irretrievable at that point.

11          And so I am very, very concerned that any

12    more delay is simply a tactic.  If Your Honor can

13    isolate and determine from those isolated incidents

14    what is appropriately payable back to the Debtor on an

15    immediate basis, it may save this entity for the

16    creditors.

17          The DIP financing by a separate entity would

18    not have allowed for setoff against the Mirabilis debts

19    or the Mirabilis transfers that were inappropriately

20    made and not disclosed on the schedules.  Mirabilis

21    transferred several hundred thousand dollars to itself

22    in the months before the filing that weren't disclosed.

23          THE COURT:  I remember.  We discussed that

24    and I guess for Mr. Bernet's benefit why it is that

25    they simply couldn't accept the terms is because

26    Ms. Boatner is there, saying:  You can't accept those

1    terms.

2            MS. BOATNER:  Well, I don't control

3    Mr. Hyman.

4            THE COURT:  I know that but in terms of your

5    concern was that there would be allowed within the

6    document some avenue of setoff that would end up

7    basically allowing or giving Mirabilis a leg up.

8            MS. BOATNER:  And the fact of the matter is,

9    Mirabilis probably loaned this Debtor money early on.

10   I don't think anyone disputes that.  The problem is

11   that at some point in that relationship prepetition

12   Mirabilis took over the Debtor and didn't in fact

13   complete its obligations under this loan document that

14   was unenforceable.

15           THE COURT:  That's at issue, I guess, in

16   maybe some of the other counts as well.

17           MS. BOATNER:  And having taken over the

18   Debtor, though, was in an ideal position to continue to

19   help itself to the Debtor's funds and did.  And,

20   consequently, we find ourselves, you know, here today

21   with a situation where the Trustee doesn't have

22   sufficient funds to continue to operate this entity

23   while Mirabilis took out, if Mr. Anthony's pleadings

24   are correct and I believe them to be, about $600,000

25   for those two allegations and another $500,000 in

26   payments.

1       So I'm very concerned that all of these

2    machinations are simply another effort to delay the

3    outcome or to delay a decision by this Court with

4    regard to the propriety of these payments and transfers

5    that if decided sooner, rather than later, could save

6    the entity and won't if it's delayed for any length of

7    time.

8       THE COURT:  I understand.  I have to act

9    consistent with due process and I have to give

10   defendants the ability to lodge their defenses and do

11   it in a way that they are -- their counsel, at least,

12   has the time to become informed.

13       However, I understand that the Debtor is

14   running out of time.  I do understand that there are

15   several counts in here that are basically no-brainers,

16   in terms of at least getting an answer in.  They look

17   like straightforward collection matters.  Now they may

18   be subject to some very complicated defenses which I've

19   heard promised.  So it may be that they can't be simply

20   tried, but we will try to get to the bottom of at least

21   those right away.

22       And I do think that counsel on this side of

23   the room has exhibited a willingness to concede some

24   time frames and to work with all of us to get some of

25   these counts going sooner, rather than later.  So I

26   appreciate what you said, but I do think that they

1 understand too and that they're all going to try to

2 work within the framework that I'm going to announce

3 now.

4   MS. BOATNER:  Thank you, Your Honor.

5   THE COURT:  You're welcome.  At some point in

6 time, and I don't know how I'll do it from a case

7 management perspective, but I'll get all the counts

8 going back together, but for right now I'd like answers

9 to Count VI, VII, VIII, and IX.  And IX, based on

10 Mr. Anthony's representation that it's strictly aimed

11 at recovery of the accounts, that the same $600,000 or

12 so that's at issue and not any kind of enrichment.

13   And I'd like for you to have your answers

14 filed by August 11th, which is one week from today, and

15 I don't think that that's -- with the exception of

16 Mr. Carraway -- well, I think Mr. Lash said he could

17 handle it -- one week from today on VI, VII, VIII, and

18 IX.

19   That is without prejudice to raise any

20 defenses that you may need to assert that you don't

21 understand at the time that you respond to VI, VII,

22 VII, and IX, that you would then want to add in when

23 you respond to I, II, III, IV, V.  And it's also

24 without prejudice if one of the two defendants or both

25 of them feels that a defensive motion is what is deemed

26 advisable, for them to do that instead.  But whatever,

1    whether it's a responsive pleading or whether it's a

2    defensive motion, by August 11th for those four counts.

3         The remaining counts will be answered and,

4    likewise, without prejudice to the parties defendant to

5    file a motion to dismiss instead of an answer in the

6    normal course.  And, that is, whenever it is that the

7    summons says, which I think was August 25th, if I'm not

8    mistaken.

9         MR. BERNET:  Yes, Your Honor.

10        THE COURT:  Because I'm putting a fast pace

11   on that and in a minute I'll tell you about discovery.

12   I will, to some extent -- and to the extent it's within

13   a reasonable time -- entertain motions to amend

14   responsive pleadings with respect to VI, VII, VIII and

15   IX.  You'll have the regular amount of time to deal

16   with the others.  So, that shouldn't be a concern with

17   respect to the other counts, I don't think.

18        Now with respect to discovery, Mr. Anthony

19   has promised discovery only directed toward the two

20   counts, although VI, VII, VII, and IX are various

21   iterations of the same demands for judgment.  And he

22   wants to be able to propound discovery that is easily

23   answerable without the necessity of a motion for

24   protective order or an objection.

25        And so, given his motivation to fast track

26   this and to not propound burdensome discovery requests,

1    I think it's fair to say that once they are propounded,

2    the parties will have 10 days, but that's without

3    prejudice to file a motion for protective order in the

4    event the discovery requests are burdensome,

5    voluminous, requests

6    -- I don't know, whatever objectionable request that

7    might be included.

8         So leave is granted, of course; those things

9    are preserved, those objections and motions for

10   protective order.  And the ruling on the discovery

11   motion is limited to discovery propounded with respect

12   to VI, VII, VIII, and IX, and not the other counts.

13        And with respect to the suggestion about a

14   status conference, is that a request to have a status

15   -- oh, I think it was a pretrial, an early pretrial

16   conference --

17        MR. ANTHONY:  Yes, Your Honor.

18        THE COURT:  -- to define the issues?

19        MR. ANTHONY:  Yes.

20        THE COURT:  All right.  Assuming that

21   something is filed by both defendants -- well, you

22   know, we all work on weekends too.  August 13th will be

23   the deadline for responding.  You know, it doesn't have

24   to be in on the 11th.  The 13th, August 13th, for

25   responsive pleadings or defensive motions.

26        Assuming that that's done, we ought to be

1    able to have some kind of a status conference in the

2    middle of that week.  Mr. Clark, do you have -- just on

3    those four counts.

4                    MR. BERNET:  Your Honor, while he's looking

5    that up, the 13th is a Sunday, I believe.

6                    THE COURT:  Yep.

7                    MR. BERNET:  So you want the response filed

8    on Sunday?

9                    THE COURT:  Or any time earlier.  What I was

10   trying to say is if you need more time on the 11th,

11   everyone works on weekends --

12                   MR. BERNET:  Oh, I see, you were giving

13   us -- I've got it.  Thank you, Your Honor.  I'm

14   sorry.

15                   THE COURT:  It's just that, you know, if it's

16   going to come in on the 11th and, you know, bankruptcy

17   lawyers -- and I know this because I always did this --

18   always comes in at the last minute with whatever the

19   deadline is; so if it's midnight on the 11th, why

20   couldn't it be midnight on the 13th?  That's my point.

21                   MR. BERNET:  Yes, ma'am.

22                   THE COURT:  With electronic filing, I heard a

23   lawyer tell me just this week that he literally filed a

24   case from the beach on his laptop.

25                   So, Mr. Clark, do you have any kind of time,

26   or do you have the calendar?

1          COURTROOM DEPUTY:  I have pulled up the

2    calendar, Judge.

3          THE COURT:  Is August 17th available for a

4    pretrial conference with respect to these four counts?

5          MR. LASH:  Excuse me, Your Honor, for

6    interrupting.  But it's just that Mr. Carraway returns

7    on the 15th.  So if maybe we could have one more day,

8    depending on how the days fall.

9          THE COURT:  August 18th, how about that?

10         COURTROOM DEPUTY:  August 18th, Judge --

11         THE COURT:  Oh, that's a trial.

12         (Discussion off the record.)

13         THE COURT:  Okay, we'll do it the 21st, at

14    9:30 then.  The Court will enter the order scheduling

15    the pretrial conference, so you all don't need to deal

16    with that in your orders that you prepare.

17          And, Mr. Anthony, they're your motions, so go

18    ahead and send the orders in and when you do, please

19    call Ms. Garcia and let her know so that we can look

20    for them, because they get submitted electronically and

21    then sorted and then there are several steps before

22    they ever get upstairs and we can go grab them that

23    way.

24          MR. ANTHONY:  Very well, Your Honor.

25         MR. BERNET:  Your Honor, just one point, the

26    discovery responses, I take it, go both ways?

1          THE COURT:  Oh, absolutely.

2          MR. BERNET:  The Trustee will be required --

3          THE COURT:  If we're going to have a trial,

4     you guys need information to frame your defenses or

5     support your defenses, I should say, at trial; then,

6     yes.

7          MR. BERNET:  Yes, ma'am.

8          THE COURT:  And the same with leave for a

9     protective order on that side as well.

10          MR. CARRAWAY:  I'm a little unfamiliar, as

11     Your Honor is aware, with bankruptcy, but will we see

12     the orders before they're sent in?

13          THE COURT:  You certainly may.

14          MR. CARRAWAY:  Could we do that?

15          THE COURT:  It will slow them down but, yes.

16          MR. CARRAWAY:  We'll turn them around

17     quickly.

18          THE COURT:  And let me just say this:  I read

19     almost every order that comes from a hearing.  And I

20     will change them.  Sometimes you won't even know it

21     because I use the touch-up text tool that's available

22     on pdf, so you have to read them when they come in.

23          MR. CARRAWAY:  Well, it's obvious you're very

24     familiar with this case, Your Honor.

25          THE COURT:  Yes, so far.

26          MR. ANTHONY:  It might be helpful -- I

1       realize that there's vacation at this point, but it

2       might be helpful for Mr. Carraway's firm to designate

3       their lead counsel so that we know exactly who to call.

4                   THE COURT:  Well, for right now, Counts VI,

5       VII, VIII, and IX are going to be babysat by Mr. Lash.

6                   MR. ANTHONY:  Sounds good.

7                   THE COURT:  And then when Mr. Carraway gets

8       back, he's going to come back and he will be

9       responsible then for the whole ball of wax.

10                  MR. ANTHONY:  And then the drafts will go --

11      the proposed orders will go sometime over the weekend

12      to Mr. Lash and I can get, I'm sure, the e-mail access

13      for PayMaster's counsel.

14                  THE COURT:  Oh, yes.  And they all have

15      e-mail addresses that you can just send them the orders

16      by e-mail.

17                  MR. LASH:  I believe they're on our signature

18      blocks now, Your Honor.

19                  THE COURT:  Pardon me?

20                  MR. LASH:  E-mail, I think, is on our

21      signature blocks now.

22                  THE COURT:  Oh.  Okay.  There you have it,

23      you're right, the new District Court Rules.

24                  MR. ANTHONY:  New rules.

25                  THE COURT:  That's right.  Now I'm going to

26      say this now because I want people to start thinking

1    about it now and not wait to start thinking about it on

2    August 21st.  With respect to these four counts -- and

3    maybe this is pie-in-the-sky and it's not workable --

4    be thinking about trying to get to a mediator rapidly.

5    Maybe you can't do that with all the others involved.

6    But if you were to get a sophisticated mediator

7    involved early, then I think that a lot of efficiencies

8    could happen with this adversary proceeding.  It's just

9    a suggestion but there are a lot of good ones out

10   there.

11           All right.  Now let's go back to the case.

12   We've got a discovery dispute.  We've got a discovery

13   dispute in the case concerning a deposition that the

14   Trustee wants to take of Mr. Amodeo that had been

15   scheduled apparently on short notice vis-a-vis the

16   formal paperwork, but maybe was agreed to and

17          maybe wasn't.

18           Has that item been worked out, Mr. Slaughter?

19           MR. SLAUGHTER:  Your Honor, let me just

20   kind of bring you up to date.  On July -- let's see,

21   June 27th, my assistant talked to Mr. Anthony's office.

22   I was not in the office.  I did not know and told him

23   I didn't know what days Mr. Amodeo would be available,

24   because he had surgery this week.

25           On August 1 -- no, on July 31, I sent a

26   letter to Tracy Marshall, of GrayRobinson, outlining

1     why I believed that there was a conflict of interest

2     for her firm representing the Trustee.  The deposition

3     -- I received notice on July 31, with a subpoena duces

4     tecum several pages long for Mr. Amodeo for Wednesday,

5     August 2.

6          On August 1, Tracy Marshall, of GrayRobinson,

7     resigned from her representation of TenShi Enterprises,

8     of Presidian Solutions -- TenShi Solutions and

9     Wellington entity, and stated in her letter that she

10    had never represented Frank Amodeo individually and we

11    would submit, Your Honor, that there is an absolute

12    conflict of facts that will revolve around whether or

13    not over the year and a half that Tracy Marshall and

14    GrayRobinson represented TenShi and also Presidian

15    Solutions whether or not she gave any individual legal

16    advice to Mr. Amodeo.

17         So with that in mind, I canceled the

18    deposition; told them that there wasn't enough notice

19    so I could look into this and learn more about the

20    underlying facts.  And what I'm proposing and what I

21    mentioned to Mr. Anthony prior to the hearing today, I

22    would agree to a deposition of Mr. Amodeo sometime not

23    this week coming up but the next week if I can take

24    Mr. Anthony and Tracy Marshall's deposition and it

25    would be limited to this case.  And then have a full

26    evidentiary hearing sometime towards the end of the

1    month as to whether or not there is a violation of the

2    Code of Professional Responsibility under the State of

3    Florida Rules and under Title 18, 327(c) of the

4    Bankruptcy Rules.

5            THE COURT:  Both of those are outside the

6    purview of my jurisdiction.  I'm not the Florida Bar

7    and I'm not the United States Attorney.

8            MR. SLAUGHTER:  As to what?

9            THE COURT:  Well, as to whether there's been

10   a violation of the Code of Professional Conduct or

11   whether there has been --

12           MR. SLAUGHTER:  Well, I understand that, Your

13   Honor.

14           THE COURT:  -- any crime committed under

15   Title 18.

16           MR. SLAUGHTER:  Well, what I'm talking about

17   is whether or not there is a conflict of interest, and

18   that would be what the Court would be deciding.

19   Whether there is not --

20           THE COURT:  Under the Bankruptcy Code

21   provision.

22           MR. SLAUGHTER:  Yes, ma'am.

23           THE COURT:  Okay.  All right.

24           MR. SLAUGHTER:  And so what I'm saying is,

25   there are facts involved in that.  Tracy Marshall has

26   been representing TenShi since August of 2005.  She had

1  an all-day conference with Mr. Amodeo on May 24 of this

2  year.  She has prepared leases for TenShi that

3  apparently the leases for the equipment will be or have

4  been used in this case for the equipment leases of

5  Community Health Solutions.

6          She prepared leases, as I understand it, for

7  Presidian Solutions, which is the lease payment for the

8  building that Community Health Solutions is involved

9  in.  So, there is involvement and it needs to be gone

10  into and I would like to present evidence to the Court.

11          And so what I'm suggesting is that we --

12          THE COURT:  You don't want to have a hearing

13  on Monday; you want me to set a trial.

14          MR. SLAUGHTER:  Yes, ma'am.  And I have one

15  more issue that I'd like to bring up.  I have an expert

16  by the name of Rob Atkinson from Florida State

17  University who is an expert in ethics and he couldn't

18  be here on Monday.  I just retained him yesterday.

19          THE COURT:  That's okay.  Monday is a

20  preliminary hearing just to sort of shake out what the

21  issues are, whether there's certain things that we can

22  narrow the focus for in the event that there is a

23  disputed fact.  You've represented that there is a

24  disputed fact.

25          MR. SLAUGHTER:  Well, clearly, my client

26  thinks that Tracy Marshall -- as the Trustee in

1  bankruptcy said today -- that he controls these

2  corporations; he is the owner of TenShi and Presidian

3  Solutions, which GrayRobinson has been representing.

4  At this very moment, there's $1,158,000 of Frank

5  Amodeo's money in GrayRobinson's account, which is John

6  Anthony's law firm.

7       THE COURT:  All right.  Mr. Anthony, what do

8  you want to tell me about Mr. Slaughter's suggestion

9  that Monday would really be a waste of time if we're

10  all here now and we can get some scheduling done?

11       MR. ANTHONY:  Sure.  Your Honor --

12       THE COURT:  There are no other necessary

13  parties to the resolution of this issue besides the two

14  -- you two lawyers; right?

15       MR. ANTHONY:  I don't believe so, Your Honor.

16  Although, obviously, the involvement of the United

17  States Trustee and Mr. Hyman, who have both been here

18  from the beginning, would be very important --

19       THE COURT:  Right.

20       MR. ANTHONY:  -- because prior to my

21  involvement formally as counsel for the Trustee,

22  obviously, these issues were investigated, disclosed,

23  and I have some regret that Mr. Slaughter has arrived

24  in this dispute fairly late when, in fact, Mr. Hyman

25  was hearing before his application was even filed that

26  there was going to be an objection to my appearing.

1    Obviously, I take it with some degree of

2    disappointment and umbrage but, to some degree, it's a

3    compliment that Mr. Amodeo finds it so important to

4    make allegations to seek to disqualify me and my law

5    firm.  In fact, Your Honor, because there has been an

6    attempt both in the record and in some of what

7    Mr. Slaughter has said today to speak in a manner that

8    might be better for an evidentiary hearing, I do want

9    to go over a couple of quick things.

10    My affidavit, filed contemporaneously with

11    our application, correctly noted that during the

12    years -- and I want to say, the best I recall, 2000

13    through 2003 or 2004 I represented a Merrill Lynch

14    subsidiary --

15    THE COURT:  Wait.  Before you get into

16    Merrill Lynch --

17    MR. ANTHONY:  Yes.

18    THE COURT:  I saw the colloquy in the papers

19    about that and Mr. Amodeo's comments about that.  And

20    you can talk to me about the fact that the firm sued

21    Mr. Amodeo in certain actions and you disclosed that

22    the firm had sued Mr. Amodeo in certain actions and you

23    stated what the causes of action were.  And that is

24    necessary for you to tell the Court that they didn't

25    involve any health-care/third-party management issues,

26    et cetera.  Okay.

1          For Mr. Slaughter's information, that's all

2     he needed to do.  He doesn't have to tell the Court how

3     it came out.  And the Court is very well aware that

4     there's a difference between a cause of action and a

5     final judgment on the cause of action.  And so that is

6     not anything I think, in terms of casting Mr. Amodeo in

7     a bad light, that you would need to worry about from my

8     part.  You are sitting next to various people that know

9     I represented convicted felons and I have represented

10     disbarred attorneys.

11          But with respect to the one Merrill Lynch

12     matter that you [Mr. Anthony] gratuitously mentioned

13     that somebody told your client that Mr. Amodeo was

14     involved in a fraudulent scheme but Merrill Lynch

15     didn't have a claim anyway and wasn't going to assert

16     one, I'm not sure why that was in there unless it was

17     part of your conflict search that popped up the name.

18          MR. ANTHONY:  Your Honor, the fact of the

19     matter is there are two Merrill Lynch relationships

20     that produced background knowledge regarding

21     Mr. Amodeo.  Mr. Amodeo, at that point, developed some

22     background knowledge regarding our law firm.

23     Apparently, his affidavits notwithstanding, he still

24     must have felt something good about our law firm

25     because, upon one of his business entities acquiring an

26     interest in one of the firm's existing clients in our

1    Orlando office, he kept that representation going.

2            And, more recently --

3            THE COURT:  The point is that in the past

4    he's consented where there has been a conflict; right?

5            MR. ANTHONY:  Exactly.  And, Your Honor, we

6    would say that the filing of an objection well after

7    our application; the filing of a motion for rehearing

8    on the last day; the agreeing, as the affidavit of

9    Christie Feminelli indicates, of the cancellation of

10   depositions the day of depositions that had been agreed

11   upon.  All of this, to me, is in furtherance of what I

12   called, in some prior hearings, this sword of Damocles.

13           My firm is a money-making operation and,

14   obviously, we're two months into the case.  The reason

15   to have these objections and things of this nature

16   or a full-blown evidentiary hearing is not to get to

17   the bottom of anything, it is to delay and decoy the

18   real -- and I'm not insinuating anything against

19   Mr. Slaughter -- but the real issue here is that we

20   need to get to the bottom of whatever there is for a

21   conflict allegation so that I will not labor under this

22   sword of Damocles or a Japanese water torture of

23   continuances and agreeing to depositions and then not

24   agreeing to them.

25           THE COURT:  Okay, here's what I say about

26   agreeing and disagreeing.  If you don't attach an

1    e-mail that says "I have agreed to this date," I just

2    think that normal conversation happens and people hear

3    different things and maybe people say things that they

4    didn't mean to be taken as the Gospel truth.  But I

5    really think when you're setting things, behind the

6    scene you should have some e-mails that demonstrate

7    that, you know:  Please confirm back to me that we have

8    scheduled this, et cetera, et cetera.

9            And I'm just saying that for future

10   reference.  And you don't want to be slowed down in

11   getting to the bottom of this issue.  Mr. Slaughter

12   says:  Let's have depositions next week; you take Mr.

13   Amodeo; we take members of the firm of GrayHarris (sic)

14   and, you know, take the discovery.

15           MR. ANTHONY:  We sent that e-mail, Your

16   Honor.

17           THE COURT:  What I -- well, do you have one

18   back from Mr. Slaughter that says, "We'll be there"?

19   That's my point.  My point is, it's very easy for you

20   to say or anybody to say we had an agreement and here's

21   my e-mail.  Well, I'm really more interested in seeing

22   what was the response back.  Because if someone

23   definitively said, unequivocally, we'll be there, well,

24   now that's an issue where somebody has backed out.

25           MR. ANTHONY:  Your Honor, that's what is

26   happening.

1          THE COURT:  Absent some, you know,

2    justifiable reason for why they backed out, then that's

3    one thing.

4          MR. ANTHONY:  Your Honor, I think that's

5    where we are.  And the reason why --

6          THE COURT:  But we don't need to go back to

7    past history.  Let's go forward on a positive note.  We

8    can't have a deposition on August 1st; right?

9          MR. ANTHONY:  No, because --

10          THE COURT:  We can't have it today and we're

11    not going to have it before the hearing Monday morning

12    which we may not even have.  But you can schedule now a

13    deposition.  You're both here.  If I have to do it

14    right here in this courtroom and you call your clients

15    and you call your calendar assistants, you know, we'll

16    do that now.  But I want to -- first of all, does

17    anyone want to leave that's not involved in this

18    dispute?

19          MR. CARRAWAY:  Thank you, Your Honor.

20          MR. LASH:  If I may, Your Honor, and in light

21    of trying to move forward on a positive note, I want

22    the Court to be aware of the timing and everything

23    else, and everyone else here, that the loan documents

24    we were given were a first draft of loan documents.  I

25    don't think we ever finished the negotiation process on

26    those.  I was not here last Friday for whatever

1    transpired.

2              THE COURT:  Are you all talking about the DIP

3    issue?

4              MR. LASH:  I am talking about the DIP issue

5    and that's it.  That's all I've got to say on the DIP

6    issue.

7              THE COURT:  Okay.

8              MR. LASH:  Having said that, I think that

9    Mr. Ellis from our office has one thing, perhaps, to

10   say with regard to the deposition, et cetera, if he

11   could.  And then I think we could leave, which would be

12   great.  Thanks.

13             THE COURT:  Okay.

14             MR. ELLIS:  Your Honor, the only point that I

15   really have to make, and I'll make it very brief, is

16   that our office seems to be noticed with some of these

17   pleadings and not others.  Of specific concern, we did

18   not receive any notice of a deposition taking place in

19   the main bankruptcy case.  We're used to, obviously,

20   going through motions for a 2004 examination, or

21   something along those lines, if the Court could please

22   instruct that we receive notice of depositions that are

23   taking place.

24             I assume that these are limited to issues

25   regarding the retention of GrayRobinson --

26             THE COURT:  Yes.

1    MR. ELLIS:  -- but we'd still like to be

2    there to make sure that that's scope is maintained and

3    get notice of that deposition --

4         THE COURT:  Okay.  Then --

5         MR. ELLIS:  -- and any discovery requests

6    that are associated with them to be afforded an

7    opportunity to object, if we need to, as an interested

8    party.

9         THE COURT:  All right.  The local rule that

10   banned the filing of discovery requests and subpoenas

11   and notices was based on the fact that the Clerk didn't

12   want to house all that paper.  That's not an issue

13   anymore.

14        So as a "case management administrative type

15   order," if someone will prepare an order that says,

16   "Discovery requests, subpoenas, notices will be

17   docketed on the docket of the Court via CM-ECF as

18   they're served," then I think you'll get them.

19        MR. ELLIS:  Okay, that will be fine.

20        THE COURT:  And, frankly, I hadn't thought

21   about that being a problem -- that local rule being a

22   problem until just now and maybe we need to revisit the

23   local rule.

24        MR. ELLIS:  Okay.

25        MR. ANTHONY:  Your Honor, it makes good sense

26   for me too, because I didn't get a copy of the

1    objection to our firm's employment.  It was mailed in

2    and we didn't get a copy.  I don't think the U.S.

3    Trustee got a copy either.

4              THE COURT:  Now wait a minute.  Let me

5    explain how that happens.  People who are not CM-ECF

6    users mail them to the court.  They get to a central

7    mailbox somewhere down there.  Someone sorts them by

8    judge.  Then they get sorted by case manager.

9              Then the case manager, along with all the

10   other duties the case manager has, at some point in

11   time during the week or maybe the next day or next

12   days, takes the stack of paper documents and has to

13   scan them in and docket it them themselves.  There is

14   definitely a delay.

15             It's not that anybody is intentionally not,

16   you know, giving you information, but you should get a

17   mailed copy via the certificate of service.

18             MR. ANTHONY:  Right, but didn't.  So,

19   that's --

20             THE COURT:  Okay.

21             MR. ANTHONY:  Obviously, I can loop in

22   Mr. Carraway so that he gets every copy of every

23   pleading in this case, whether or not it relates to a

24   contested matter or an adversary proceeding in which

25   he's involved, if that's what they're requesting?

26             MR. CARRAWAY:  Yes, Your Honor.

1          MR. ANTHONY:  They weren't entitled to that

2     notice --

3          THE COURT:  Well, I tell you what, why don't

4     you go ahead and file a notice of appearance as

5     co-counsel --

6          MR. CARRAWAY:  We did, Your Honor.

7          MR. ELLIS:  We have an appearance in the main

8     case, Your Honor.

9          THE COURT:  Okay.  All right.  I think the

10    problem was just that you weren't -- nobody files

11    discovery in cases --

12         MR. ANTHONY:  Right.

13         THE COURT:  -- because we were all trained to

14    not do that.  And Judge Corcoran used to, in fact,

15    enter an order striking it and so forth.

16         Mr. Bernet?

17         MR. LASH:  That's right, Your Honor.

18         MR. BERNET:  Yes, Your Honor, if we're done

19    with that, your invitation to allow us to leave,

20    subject to one little comment --

21         THE COURT:  Yes.

22         MR. ELLIS:  Would you like me to prepare

23    an order, Your Honor, on that and I'll run it by

24    Mr. Anthony?

25         THE COURT:  Yes, please.

26         MR. ELLIS:  Okay.  Fair enough.

1          MR. BERNET:  Common PayMaster's position with

2     regard to the conflict is that it doesn't have one,

3     except that we're concerned that any depositions not

4     free wheel into issues which would relate to issues

5     beyond GrayRobinson's present, my understanding,

6     representation of two creditors in this case, TenShi

7     Enterprises and Presidian Solutions.

8          THE COURT:  And a third one.

9          MR. BERNET:  Oh, and Mr. Amodeo.

10          THE COURT:  Wilmington -- what did you say,

11     Wellington?

12          MR. SLAUGHTER:  Wellington.  I think it's

13     called Wellington Management.  But I'm reading Tracy

14     Marshall's letter, just Wellington.

15          THE COURT:  Wellington.  So three entities

16     and Mr. Amodeo.

17          MR. BERNET:  And my preference would be to

18     not attend that deposition.  And if there were a

19     mechanism built in that would permit counsel to

20     instruct witnesses in good faith not to answer

21     questions beyond the scope of the particular contested

22     matter, then I don't have to go and I can save my

23     client some money.

24          THE COURT:  Is there any reason why the name

25     Common PayMaster would come up in the deposition that's

26     limited to whether or not your firm is disinterested or

1    has represented an interest adverse to the estate.

2             MR. ANTHONY:  I didn't understand what

3    Mr. Bernet said until you just asked that question.

4    No, Your Honor.  The truth of the matter is, in the

5    bankruptcy Schedules, Statement of Affairs and all the

6    other pleadings that Mirabilis signed in this case

7    during the months before Mr. Hyman was appointed, there

8    is no reference to TenShi --

9             THE COURT:  We know.  I know.

10             MR. ANTHONY:  -- there is no reference --

11             THE COURT:  And Mr. Konicki filed it.

12    Mr. Konicki was an employee of Mirabilis.  I understand

13    that.

14             MR. ANTHONY:  Right.  And Mirabilis filed

15    numerous other pleadings, didn't copy all of these

16    other business entities that are attributed as former

17    clients of Tracy Marshall in our Orlando office of

18    GrayRobinson.  The truth of the matter is we have very

19    simple issues, Common PayMaster issues.  If we wanted

20    to put in every cause of action that we think --

21             THE COURT:  No, no, we're talking about the

22    attorney disqualification issue.  When you depose

23    Mr. Amodeo, is there any reason why the phrase "Common

24    PayMaster" is going to come up in that deposition?

25             MR. ANTHONY:  I don't believe so, Your Honor.

26    I think this is all relating to Mr. Amodeo proving up

1  what he says in his two affidavits -- scurrilous

2  affidavits.

3      THE COURT:  Now, Mr. Slaughter, is there any

4  reason why you, in crossing your own client, are going

5  to elicit any answer that would include the name

6  "Common PayMaster"?

7      MR. SLAUGHTER:  I can't imagine it, no.

8      THE COURT:  Okay.  Don't discuss Common

9  PayMaster.  You both have said it's not an issue for

10  that matter.

11      MR. BERNET:  Or the issues in the adversary.

12  Because those are not relevant to whether GrayRobinson

13  can represent the Trustee

14      THE COURT:  That is correct.  When you look

15  at the discovery rules, it's limited in scope now to

16  the matters that are alleged that are at issue in the

17  particular contested matter or adversary proceeding

18  that is the reason causing the discovery.  And so the

19  scope of the rule itself limits the inquiry.

20      MR. SLAUGHTER:  Your Honor, Mr. Anthony --

21      THE COURT:  And I don't sense from these two

22  that they're going to get all warm and fuzzy and you're

23  going to all of sudden give him a whole bunch of

24  information to be used against your client.

25      MR. SLAUGHTER:  Just his last comment about

26  the scurrilous allegation in the affidavit.  I can say

1    as an officer of the Court, practicing law in Federal

2    Court for 33 years, I don't believe it's scurrilous and

3    I think it's in good faith.  I believe there's an

4    actual conflict of interest.  And for you to designate

5    these affidavits and Mr. Amodeo's position that there

6    is a conflict and calling it scurrilous, I think that

7    it shouldn't have a place when he's talking to a

8    Federal Bankruptcy Judge calling what my client has put

9    in under oath in an affidavit, in a good faith

10   affidavit, as scurrilous.  Because I've looked into

11   this and I don't believe they're scurrilous.

12            THE COURT:  Okay.  Let me --

13            MR. ANTHONY:  And he looked into it so much

14   that he wrote my partner and not me.

15            THE COURT:  Stop.  Just a minute.  This firm

16   is mad at your client for what your client said.  Your

17   client is mad at this firm --

18            MR. SLAUGHTER:  Absolutely.

19            THE COURT:  -- for what this firm said in

20   writing about your client.

21            MR. SLAUGHTER:  That's correct.

22            THE COURT:  And I hope I've explained to you

23   how that's nothing that I am going to be pre-judging.

24   Do you understand the stuff --

25            MR. SLAUGHTER:  Yes.

26            THE COURT:  -- why that was in there about

1          Merrill Lynch?

2                    MR. SLAUGHTER:  Your Honor --

3                    THE COURT:  Now wait just a minute.  These

4          gentlemen would like to leave.  I would like you to

5          stay for a reason that will become apparent.

6                    So, you're excused if you'd like.

7                    MR. CARRAWAY:  Thank you, Your Honor.

8                    MR. LASH:  Thank you, Your Honor.  But we

9          won't miss anything like last Friday when there was

10         evidently some discussions about --

11                   THE COURT:  About future motions to come and

12         things?  No, I don't think so.

13                   MR. LASH:  Thank you, Your Honor, appreciate

14         it.

15                   MR. ELLIS:  Thank you, Your Honor.

16                   MR. SLAUGHTER:  Your Honor, could I just make

17         one comment in response to what the U.S. Trustee said

18         about Mr. Amodeo, their being aware of other

19         bankruptcies in which there was allegations of fraud.

20         There may have been allegations of fraudulent transfers

21         but I can tell the Court, as an officer of the Court,

22         the ones that I've looked into, there were findings by

23         bankruptcy judges that found that there were no

24         transfers or fraudulent transfers and that the monies

25         allegedly taken from Merrill Lynch just did not exist.

26                   And for these statements to be continuously

1    made, Mr. Amodeo is a convicted felon, et cetera, is

2    just not appropriate.

3              THE COURT:  Mr. Slaughter, if we have a trial

4    and if that is a relevant piece of information that can

5    come in under the Federal Rules of Evidence, they're

6    free to bring it in provided it's not subject to an

7    objection and so forth.

8              But let me say to you again I have

9    represented convicted felons, white collar criminals.

10   I have represented notorious businessmen and I have

11   represented disbarred lawyers.  And with respect to the

12   cast of people I'm talking to, I am still social

13   acquaintances with those people.

14             So please don't worry about labels.  Labels

15   are not relevant.  What is relevant is a person's

16   credibility, as challenged legitimately under the

17   Federal Rules of Evidence.

18             MR. SLAUGHTER:  And I will be willing to

19   stipulate that he's a convicted felon and a disbarred

20   attorney.  It gets said in every hearing, I believe, in

21   looking at the transcript and doesn't need to be --

22   keep being said by everybody.

23             THE COURT:  Okay.

24             MR. ANTHONY:  And, Your Honor --

25             THE COURT:  If it's relevant to a credibility

26   challenge, bring it up.  But you know that that doesn't

impress, you know, in terms of whether I'm going to

think that Mr. Amodeo is a bad man.  Okay?  So, let's

not go there until it becomes relevant from an

evidentiary standpoint.

MR. ANTHONY:  Well, let's find --

THE COURT:  But wait.  I want to also get

Mr. Bernet -- I want him to be able to leave too so

that he doesn't have to bill his client for something

that I'm really asking him to stick around for, sort of

as a friend of the Court, in terms of trying to give

you some ideas about how your tensions might be worked

out.

Mr. Slaughter, the relevant Bankruptcy Code

provision is Section 327(c) and (a).  And those are the

issues that what I have to decide and that is whether

the firm, let me see, held or represented at the time

that they were involved, getting into the estate, an

interest adverse to the estate and that they are

disinterested persons.  Those are the bankruptcy

issues.  And you can represent somebody and not run

afoul of that provision if you represent the trustee in

a case.

Now where there has been a problem, and this

is why I'm happy that Mr. Bernet is here because it

worked fairly well, I was involved in a case where it

became apparent over time that the law firm that was

1     representing the Chapter 11 trustee had a conflict.

2     That law firm was put into the position of having to

3     sue its own client and, by the way, a substantial

4     client.

5          And what happened in that case is -- and this

6     is before Judge Glenn -- it was worked out that the

7     trustee hired special counsel simply to pursue the one

8     entity that created a conflict for the regular counsel

9     to pursue.  And it worked quite well, as I recall.

10    Mr. Bernet was in the case.

11         I'm not asking you to comment on anything

12    about the law, but just -- that worked, didn't it?  It

13    worked very well?

14         MR. BERNET:  It worked in that context.  But

15    in that context, that client was the target of an

16    adversary proceeding, but was not a general creditor in

17    the estate --

18         THE COURT:  Right.  That's true.

19         MR. BERNET:  -- which is a different issue

20    here, because the GrayRobinson firm is alleged to

21    represent creditors of the estate, specifically the

22    landlord of the Debtor and the equipment lessor of the

23    Debtor.

24         THE COURT:  Okay.

25         MR. BERNET:  So we didn't have quite the same

26    kinds of issues.

1          THE COURT:  But, nonetheless, the entity --

2     it was dealt with very efficiently by peeling that

3     discrete item off and handing it to a special counsel

4     and it was special counsel that then pursued that

5     entity and it basically erased the problem created by

6     the conflict that the firm had in being required, in

7     its fiduciary duty, to pursue that entity, even though

8     the entity was the client of the firm.

9          So I'm throwing that out for you so that when

10    we leave here today, you all can be thinking about

11    that.

12         And now you are excused and thank you very

13    much.

14         MR. BERNET:  Thank you, Your Honor.

15         MR. ANTHONY:  And, Your Honor --

16         (Whereupon, Mr. Bernet handed Mr. Anthony a

17    document.)

18         THE COURT:  Now let me keep going here.

19         MR. ANTHONY:  All right.

20         THE COURT:  I start with 327(a) and (c).  My

21    next comment is, however, if the Florida Rules of

22    Professional Conduct would require a firm to obtain

23    consent of its client, that's a different issue and

24    that goes on in the business offices of the firm behind

25    the scene.

26         So, I will set this matter for hearing.

1        You've heard what I had to say.

2                 MR. ANTHONY:  I'm going to assume that the

3        discovery I just got is subject to Your Honor's ruling.

4                 THE COURT:  For?

5                 MR. ANTHONY:  Common PayMaster.  They had

6        plenty of time to get this discovery over to me.

7        So, I've got request for production; request --

8        interrogatories --

9                 THE COURT:  This is in the adversary

10       proceeding?

11                MR. ANTHONY:  Yes, Your Honor.  I'm going to

12       assume that this is subject to the same scope issues

13       that Your Honor defined in your order.

14                THE COURT:  Well, no, it's in the rules.

15                MR. ANTHONY:  Perfect.

16                THE COURT:  And to the extent that those

17       documents request discovery that would be --

18                MR. ANTHONY:  Be outside of the counts that

19       are accelerated --

20                THE COURT:  -- outside of VI, VII, VIII, or

21       IX, you know, in good faith that you couldn't read them

22       at all to relate to VI, VII, VIII, or IX, then, yes,

23       you get the longer discovery period.

24                Okay.  So let's set a trial.  You probably

25       don't know yet how long it will take, but I sense that

26       there will be only three witnesses.

1          MR. SLAUGHTER:  Well, there would be Jodi

2     Jaiman, who's the president of TenShi; and maybe one

3     other person.

4          THE COURT:  So, five?

5          MR. SLAUGHTER:  Yes.

6          THE COURT:  All right.

7          MR. ANTHONY:  I don't know who Jodi Jaiman

8     is, but I believe she's one of the people who got a

9     letter formalizing the firm's withdrawal.  Your Honor,

10    in all fairness, some of this commentary about the

11    nature and extent of the conflict is terribly

12    frustrating to listen to --

13         THE COURT:  I know.

14         MR. ANTHONY:  -- without responding to it.

15    Obviously, it was very frustrating to clear the number

16    of calendars that we had to clear for a request for a

17    protective order to be filed after the time that the

18    depositions were continuing.  We wasted a lot of time;

19    we wasted a lot of money; and it gratifies --

20         THE COURT:  Well, we're going to -- like I

21    said, right here today, we're going to schedule this.

22         MR. ANTHONY:  That would be great.

23         THE COURT:  Okay?  Now we have a -- do you

24    have access to Mr. Amodeo?

25         MR. SLAUGHTER:  Your Honor, I talked to him

26    yesterday.  He has a bad week next week.  Obviously, we

1    can clear any day.  And I don't know about Mr. Anthony.

2    I'm clear next week and the following week up until

3    Friday.  And I have a house rented above San Francisco

4    on the ocean and I'm trying to go see my daughter for a

5    week --

6              THE COURT:  So beginning --

7              MR. SLAUGHTER:  -- leaving that Friday.

8              THE COURT:  Beginning the 19th?

9              MR. SLAUGHTER:  Yes, ma'am.

10             THE COURT:  And, Mr. Warren, you're here,

11   although you've not really jelled your relationship.

12   But assuming you did, do you have access to speak to

13   the president of -- is it TenShi?

14             MR. WARREN:  Your Honor, I've only spoken to

15   her today.  It's my understanding GrayRobinson has

16   notified them today or yesterday or sometime in the

17   very near recent past that they will no longer

18   represent that firm.  So, that's why they called me

19   today.

20             THE COURT:  Okay.

21             MR. WARREN:  I don't think Your Honor should

22   address my schedule with respect to setting up this

23   discovery.

24             THE COURT:  Well, I wanted to see if you

25   could get input from -- okay.

26             MR. WARREN:  But I will certainly --

1          THE COURT:  You're right.  That deposition

2     can wait.  What we're talking about is Mr. Amodeo,

3     Mr. Anthony and Ms. --

4          MR. SLAUGHTER:  Tracy Marshall.

5          THE COURT:  -- Marshall for sometime between

6     now and August 18th.  So, what I would like for you all

7     to do while we're looking around for, what do you

8     think, a day of hearing?

9          MR. ANTHONY:  Yes.

10          THE COURT:  While we're looking around for a

11     day of hearing, you all can go up to the tenth floor,

12     we have an office up there with a phone, and you can

13     call your offices and your clients and come back to me

14     with a day.  Do you think that the depositions could be

15     taken in one day?

16          MR. ANTHONY:  That's the way we planned it

17     the first time.  I think that will work and it will

18     work particularly well if they're in Orlando where

19     Mr. Amodeo and where his counsel and where Tracy

20     Marshall primarily work.

21          THE COURT:  Okay.  And then when you come

22     back, absent the consent and straight conflict, I'd

23     like to hear from Mr. Anthony:  What is Mr. Amodeo's

24     involvement in the case that would involve a lawyer's

25     services in pursuing him for something?  But you don't

26     have to do that now.  Go on up and make your calls.

1              Mr. Hyman, would you like to be excused?

2              MR. HYMAN:  If I could, Your Honor.

3              THE COURT:  Ms. Boatner, do you want to stay

4         around?

5              MS. BOATNER:  Yes, Your Honor.

6              THE COURT:  Okay.  All right.

7              MR. WARREN:  Your Honor, could I inquire --

8              MR. ANTHONY:  The U.S. Trustee --

9              MR. WARREN:  My issue would be whether the

10        Monday hearing is going to go forward?

11             THE COURT:  No, sir.

12             MR. WARREN:  It is not?

13             THE COURT:  No, sir.

14             MR. WARREN:  If I may, I'll --

15             THE COURT:  I am going to go ahead -- I think

16        Mr. Slaughter's suggestion makes perfect sense.  He's

17        here, Mr. Anthony is here.  Mr. Anthony has pointed out

18        that Mr. Hyman and Ms. Boatner are here and they're the

19        only ones who possibly would want to come Monday

20        morning, so let's just do it now.

21             MR. WARREN:  And because TenShi is the

22        subject of the discovery dispute right now, if I do get

23        involved in the case, I'll work out with Mr. Anthony

24        what discovery he might wish with respect to TenShi.

25             MR. ANTHONY:  We don't want any discovery

26        from TenShi, from Presidian or from any other former

1   client that our firm's Orlando office has had in the

2   past related to Mr. Amodeo.  We can make that pretty

3   easy.

4          Now it's Mr. Amodeo's motion -- or objection

5   and motion for rehearing and I believe that that's what

6   we're traveling on, Your Honor.  So the involvement of

7   an attorney for TenShi or for Presidian or for those

8   Sunshine companies, to me, I'd want to know what that's

9   about, quite frankly.  They have no pending motion.

10  There will be no discovery directed toward them.  So I

11  really don't know what that's about.

12         THE COURT:  Well, Mr. Amodeo alleges that

13  he's either an owner or a control person of those

14  entities and that, therefore, the firm's

15  representations of the entities are tantamount to

16  representation of him individually in some respect.

17         MR. ANTHONY:  And that's totally inconsistent

18  with all governing law.  So -- and bracketing even that

19  -- I guess Mr. Amodeo is free to say how he might have

20  ever been represented by our law firm, but we don't

21  believe that we need to make that leap.

22         THE COURT:  Listen.  Remember the issue --

23  the bankruptcy issue is 327(a) and (c), which permits

24  conflicts to have existed --

25         MR. ANTHONY:  Right.

26         THE COURT:  -- and it permits prior

1    representation.  It permits all of that.  What it

2    doesn't permit is that you represent an interest that

3    is adverse to the estate or that you represent -- or

4    that your firm is not disinterested.

5              MR. ANTHONY:  Right.

6              MR. WARREN:  And just so there aren't any

7    secrets, Your Honor, I understand that TenShi filed a

8    proof of claim in the case and that GrayRobinson has

9    until recently been their counsel and may still be

10   their registered agent.

11             THE COURT:  And if an objection -- if the

12   Trustee in his discretion thinks that the claim is

13   objectionable and if we -- and that may never happen --

14   but if it is, then we can simply do the special counsel

15   thing that I mentioned earlier.  And that is Mr. Hyman

16   can do what the trustee in the case I mentioned did and

17   that is hire another counsel just for that discrete

18   objection.

19             MR. WARREN:  And just so the Court will know,

20   I was not contacted to be involved in the issue

21   regarding retention of counsel but to protect the

22   interest of TenShi as a creditor in the case.  So.

23             MR. ANTHONY:  Your Honor, could I just

24   inquire?  I ran the docket.  I didn't know that there

25   was a proof of claim.  Now maybe the claims register

26   hasn't been updated quite as recently, but I was

1    unaware of that.

2              MR. WARREN:  I received it.  It was attached

3    to an e-mail I received from my client.  So.

4              THE COURT:  While you're up there calling,

5    we'll be happy to look it up for you.  And, Mr. Warren,

6    you're free to go and we won't have a hearing Monday

7    morning.

8              MR. WARREN:  Thank you, Your Honor.

9              THE COURT:  You're welcome.

10             MR. SLAUGHTER:  What room on the 10th floor,

11   Your Honor?

12             MR. ANTHONY:  I'll show you.

13             THE COURT:  It's on this end of the building

14   two floors up, around the hallway.

15             MR. SLAUGHTER:  Thank you.

16             THE COURT:  And Court will be in recess,

17   although I'll stay up here.

18             MR. ANTHONY:  Thank you, Your Honor.

19                  (Discussion off the record.)

20             THE COURT:  Okay, we're back on the record.

21   Counsel have returned.

22             MR. SLAUGHTER:  August 16th, Wednesday, in

23   Orlando.

24             MR. ANTHONY:  And, Your Honor, the good news

25   on that is that my deposition is fine on that date;

26   Mr. Amodeo's is; and I believe that Jodi -- what's her

1      name?

2                  MR. SLAUGHTER:  Oh, Jodi Jaiman, who is the

3      president of Presidian.

4                  MR. ANTHONY:  And Jodi Jaiman and the U.S.

5      Trustee are okay with that.  I have been unable this

6      afternoon, actually before the hearing and during this

7      intermission, to get a hold of Tracy Marshall.  And if

8      that date won't work, then I'm sure we will have a date

9      by that date where it's either the day before or the

10     day after when we're out there anyway.

11                 THE COURT:  Is that okay?

12                 MR. SLAUGHTER:  Yes.  In a conciliatory move,

13     I find it fine to do the depositions at GrayRobinson.

14                 MR. ANTHONY:  Very conciliatory of brother

15     counsel.

16                 THE COURT:  Let's talk about the order of the

17     depositions, who goes first; who goes second; who goes

18     third.

19                 MR. SLAUGHTER:  Mr. Amodeo was prepared to go

20     first.

21                 THE COURT:  All right.  And then?

22                 MR. ANTHONY:  I would think Ms. Marshall.

23                 THE COURT:  Marshall, if she's available.

24                 MR. ANTHONY:  Exactly, and Jodi?

25                 MR. SLAUGHTER:  Jaiman.

26                 MR. ANTHONY:  Jaiman?

1          MR. SLAUGHTER:  Yes.

2          MR. ANTHONY:  That will be fine then.  And I

3    assume they'll go until they're done.

4          MR. SLAUGHTER:  Yes.

5          MR. ANTHONY:  And, Your Honor, it became

6    apparent that I don't want to hold anything back and I

7    don't want to have some potential witnesses hanging out

8    there.  It's possible that based upon how the testimony

9    goes that either Mr. Hyman or Mr. Konicki might be

10   called.  Mr. Hyman would have a very narrow focus

11   relating to the conflict issue and Mr. Konicki would be

12   fairly narrow as well, depending upon how the testimony

13   lays out.

14         THE COURT:  Well, I wasn't suggesting that

15   you all schedule every single deposition that you might

16   need.  It was just to get Mr. Amodeo's scheduled and

17   you and Ms. Marshall.

18         MR. ANTHONY:  Yes.  And we might not even

19   depose them.  I'm just trying to think through a

20   one-day trial who might show up at that and I can't

21   come up with anyone other than those folks.

22         THE COURT:  And Mr. Amodeo will go first and

23   then -- well, depending on who's available:  Marshall,

24   Jaiman, and Anthony.  And Anthony definitely on the

25   16th.

26         MR. ANTHONY:  Yes, that's correct.

1          THE COURT:  If there is a discovery dispute,

2     then you can call me.  That is a Chapter 13 day, which

3     means I'm on the bench pretty consistently from about

4     2:15 until maybe 4:00.

5          COURTROOM DEPUTY:  Actually, Judge, the 16th,

6     that's your two-day trial.

7          THE COURT:  Oh, that's right.  I'm sorry.  Is

8     it the 16th/17th?

9          COURTROOM DEPUTY:  The 16th and the 17th,

10    yes, ma'am.

11         THE COURT:  Well, you can have someone bring

12    in a note to me if it's something that's really

13    critical and then we can take a brief adjournment.

14         So, we'll have an order from this hearing

15    that grants in part and denies in part the motion for a

16    protective order.  The fact that Mr. Amodeo hasn't been

17    served yet, I believe, now has been waived?

18         MR. SLAUGHTER:  Yes.

19         THE COURT:  So to that extent, it's denied.

20    It's granted to the extent that it was originally

21    scheduled on short notice.  And now it has been

22    rescheduled for August 16th coincident with

23    Mr. Anthony's deposition and, hopefully,

24    Ms. Marshall's.  And if Ms. Jaiman is available,

25    so much the better.

26         And in that order, we will also have a

1    decretal paragraph that says that the hearing Monday is

2    canceled and the Court will enter by separate order a

3    final evidentiary hearing order.

4          MR. SLAUGHTER:  Do you have any idea when the

5    hearing would be, Your Honor?

6          THE COURT:  Yes, Mr. Clark, give me a date.

7    How long do you think you need to flesh out your

8    discovery?  We don't want to prolong this because

9    Mr. Anthony needs to know if he's going to be in or

10   out, you know, as soon as possible.

11         MR. SLAUGHTER:  I mean I can't imagine

12   discovery past the week we're talking about.

13         MR. ANTHONY:  I agree, Your Honor.  This was

14   a notice of taking deposition duces tecum.  It wasn't

15   terribly abstruse.  It's one sentence, "All documents

16   that suggest there's a conflict."  There were a lot a

17   definitions for some reason, but there was no -- we're

18   happy to go on that.

19         THE COURT:  Okay, what does August 30th or

20   31st look like, Mr. Clark.

21         MR. ANTHONY:  Your Honor, I have one -- you

22   actually have set a hearing on my birthday and I didn't

23   object, but there is something more dear and that's the

24   end of our fiscal year and that's August 31.  And

25   August 30 and 31 --

26         THE COURT:  Are you going to be out there

1    rustling up checks?

2             MR. ANTHONY:  I will be in Orlando but for a

3    very specific purpose.

4             THE COURT:  I see.  And when is your

5    birthday?

6             MR. ANTHONY:  The 21st of August.  But that's

7    not a problem.  I didn't object to that.  It's some --

8    I have two daughters whose birthdays are between now

9    and that time and I would have objected for either of

10   my daughters' birthday or for a cash day.

11            THE COURT:  How about the 28th or 29th,

12   Mr. Clark?

13            MR. ANTHONY:  Perfect.

14            MR. SLAUGHTER:  That's fine, Your Honor.

15            COURTROOM DEPUTY:  The 28th or 29th are not

16   available for that.

17            THE COURT:  How about August 25th?

18            COURTROOM DEPUTY:  The 25th, there is nothing

19   scheduled, Judge.  Now I don't know if you're out that

20   day or something, but there is nothing on the calendar

21   for then.

22            MR. ANTHONY:  It's fine with me.

23            THE COURT:  Okay.  But that order -- in your

24   order, Mr. Anthony, just put:  By separate order, the

25   Court will schedule a final evidentiary hearing.  And

26   then we'll take care of the August 25th formal order.

1          Now unlike adversary proceedings,

2     Mr. Slaughter, we don't apply Rule 26(f) to contested

3     matters unless requested.  I'm thinking it probably is

4     not necessary for your contested matter on the

5     disinterestedness and the adverse interest.

6          MR. SLAUGHTER:  If I knew what Rule 26 is,

7     I'd --

8          THE COURT:  Oh.  Well, it's the one that

9     requires counsel to get together and meet and map out a

10    discovery plan and also right after that meeting,

11    within a certain number of days, you have to disclose

12    all the witnesses you intend to call.

13         MR. SLAUGHTER:  That would be fine, Your

14    Honor.

15         THE COURT:  Okay.

16         MR. ANTHONY:  We were just doing that.

17         THE COURT:  You just had your meeting.

18         MR. ANTHONY:  So I don't think -- we're

19    making some real progress on that.

20         THE COURT:  Okay,  You just had your meeting,

21    so within "x" number of days, you know, disclose your

22    witnesses to each other --

23         MR. SLAUGHTER:  Right.

24         THE COURT:  -- whatever the rule says.  Now I

25    don't see a TenShi proof of claim here.  It could be

26    that a proposed proof of claim was e-mailed to

1     Mr. Warren and, therefore, that was why it doesn't

2     appear.

3           What I do have, and you can tell me if your

4     man is involved in any of these: George & Fisher,

5     that's one entity; Suddath Relocation Systems;

6     Southeastern Telecom; Aetna; the Tax Collector of

7     Pinellas County; Beth Frazier; Rhonda Masters; Dwight

8     Darby & Company; Michael Masters; Sir Speedy; another

9     one for George & Fisher; Gail Demeter; Jon Frazier; two

10     for the Internal Revenue Service; something call

11     Guardian; Horizon Health; Rhonda Masters; Michael

12     Masters; Atlantic Relocation Systems; Imperial A.I.

13     Credit Companies; SHPS Health Management; Scott Wells

14     Clemons; Health Management Associates, Inc.; Gary

15     Simmons; McKesson Health Solutions; MBNA America

16     Delaware, two of those, probably a credit card;

17     Credential Leasing. Is that one your guy?

18           MR. SLAUGHTER: Your Honor, I just -- I don't

19     know. I mean I know that he owns Presidian and I know

20     that he owns TenShi. I couldn't name another company

21     in his world that he owns, but I know he owns a number

22     of them.

23           THE COURT: Well, so we'll know the universe

24     because the bar has already come and gone; correct?

25           MR. ANTHONY: Correct.

26           THE COURT: Okay. Gary Simmons; Bell South

1    Telecommunications; Paul Clifford; Graham Smith; Brown

2    Carroll (phonetic), LLP; Mirabilis Ventures, Inc. --

3    and I've already heard about some connections there, no

4    fact finding, of course, on whether there are in fact

5    connections; Brown Carroll, LLP; another for the IRS;

6    there's Spherion, S-p-h-e-r-i-o-n; and Pitney Bowes,

7    Inc.; and that's it.

8            MR. ANTHONY:  And, Your Honor, of course, not

9    to gild the lily, but Ms. Marshall's affidavit says who

10   the --

11           THE COURT:  I know.  I mean I thought if I

12   could just share all of those with you, then it might

13   simplify --

14           MR. ANTHONY:  And if one looks at the

15   schedule relating to executory contracts and unexpired

16   leases, one searches in vain for the entity that was

17   supposed to be a landlord.

18           THE COURT:  Okay.  Well, I think this has

19   been helpful.  I'm glad, Mr. Slaughter, you suggested

20   we don't all get back together Monday morning.

21           Mr. Anthony, you can send the order over the

22   same way with the other ones.  Call Ms. Garcia; run it

23   by Mr. Slaughter first.

24           MR. SLAUGHTER:  So Monday is canceled?

25           THE COURT:  Yes.

26           MR. ANTHONY:  It's kind of like we just did

1      it is my --

2                 THE COURT:  Yeah, we just did it and he's

3      going to specifically put that in the proposed order --

4                 MR. SLAUGHTER:  Thank you.

5                 THE COURT:  -- which probably won't be

6      entered before Monday at 9:30, but you just know don't

7      come back.

8                 MR. SLAUGHTER:  Thank you.

9                 MS. BOATNER:  Thank you, Your Honor.

10                 MR. ANTHONY:  Thank you, Your Honor.

11                 THE COURT:  Thank you all.

12                 (Whereupon, the hearing concluded at

13      4:15 p.m.)

14

CERTIFICATE OF REPORTER

STATE OF FLORIDA        :

COUNTY OF HILLSBOROUGH :

      I, Kimberley S. Johnson, Official Court Reporter and Notary Public, do hereby certify that the foregoing proceeding was reported by me at the time and place therein designated and that the foregoing pages constitute a true and correct copy of my reporting.

      I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor financially interested in the foregoing action.

      BE IT KNOWN that I shall not attest to the accuracy nor content of any other than the original transcription herein set forth, excepting copies that are made by me by whatever means, containing my original signature only.

      WITNESS my hand this 28th day of August, 2006, at Tampa, Hillsborough County, Florida.


_____
Kimberley S. Johnson, CVR
Certified Verbatim Reporter
Notary Commission No. DD449281
Commission Expiration: 8/29/09